**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Samuel VRETTA, Defendant-Appellant.**

**No. 84–2991.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1986.

Decided May 13, 1986.

As Amended May 20, 1986.

Glenn C. Reynolds, Madison, Wis., for defendant-appellant.

Stephen J. Liccione, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

The defendant, Samuel Vretta, was indicted by a grand jury for kidnaping Allen Hauser, in violation of 18 U.S.C. § 1201. Vretta was found guilty after a seven day jury trial and was sentenced to life imprisonment. Vretta appeals his conviction. We affirm.

## I

The evidence reveals that Vretta met Allen Hauser in 1978 in Dearborn, Michigan where Hauser sold Vretta on investing his life savings of $25,000 to help underwrite Hauser's development of an alleged light sensitive photographic process. Vretta subsequently demanded the return of his money, pursuant to the terms of the investment agreement that allowed Vretta to request a refund by "June 1, 1979." Hauser failed to return Vretta's investment. Vretta became aggravated about not having his money returned and retained a lawyer to sue Hauser for the return of his investment. Vretta's lawyer obtained a default judgment against Hauser in a Wisconsin state trial court in 1981, but was unable to satisfy the court judgment. Vretta's next step was to hire a private investigator named Paul DeSalvo to determine if Hauser had any collectible assets. DeSalvo stated that Vretta became increasingly frustrated with his inability to uncover any collectible assets and/or recoup his investment. The record reveals that thereafter Vretta took matters into his own hands and

began making threats and performing an act of vandalism toward Vretta and his family in an attempt to force Hauser to return his money. In support of its contention concerning Vretta's actions, the government introduced telephone records at trial demonstrating that Vretta called Hauser on numerous occasions between late 1981 and September 20, 1983, the day Allen Hauser disappeared from his Elm Grove, Wisconsin home. As detailed later in this opinion, several witnesses were allowed to testify at trial that Allen Hauser had told them that Vretta had made verbal telephone threats against Hauser's life and his family. At trial, the government also established that Vretta threw a smoke bomb into the Hauser home in July of 1983, two months before the kidnaping.

The evidence demonstrates that on September 20, 1983, at approximately 10:00 a.m., Vretta registered at the White Court Motel in Milwaukee, Wisconsin. Shortly thereafter, at approximately 10:15 a.m. he rented a rusted, green Buick Skylark from a nearby car rental agency licensed as "Rent-A-Heap" and after renting the Skylark, Vretta parked his own white and orange Volkswagen van at a gas station across the street from the "Rent-A-Heap" agency. Sometime thereafter, on September 20, 1983, between 11:30 a.m. and 12:00 noon, a neighbor of the Hausers spotted a rusted, drab green car pulling into the Hauser driveway in Elm Grove, Wisconsin. Mark Hauser, one of Hauser's sons, who was employed on the second shift at a local restaurant, was home on that particular day as he had a scheduled doctor's appointment for 1:10 p.m. that afternoon. The government's investigation revealed that he failed to keep that appointment and at approximately 3:00 p.m. on that day his sister, Michelle, arrived home and found her brother's lifeless body lying face down in the Hauser's family room, his hands and ankles bearing ligature marks from being tied together, indicating that restraints had been used and later removed. The government investigators also discovered blood

stains on the Hauser's living room carpeting, consistent with the blood of Allen and Mark Hauser.[1]

Allen Hauser's wife recounted that on that same day, September 20, 1983, Allen Hauser arrived at his home about 7:30 a.m. after returning from the County Jail where he was serving a one-year sentence for fraud under a work release program. After Allen Hauser dropped his wife off at work at 9:30 a.m., he arrived at the business of a Kathryn Stowe, a family friend, at 9:45 a.m. He took her car to a service station and left the service station some time between 12:30 and 1:00 p.m., which was the last time Allen Hauser was seen alive. Later that day, Mrs. Stowe's car was found parked in the Hauser driveway and Stowe's car keys were found on the floor of the Hauser living room.

The next day, September 21, 1983, at approximately 6:00 a.m., the person residing in the room next to Vretta's room at the White Court Motel observed Vretta outside of his motel room. Vretta returned the rented green Buick Skylark to Rent-A-Heap at 8:00 a.m. and returned to the motel where he checked out. On the day following, September 22, 1983, Allen Hauser's badly beaten and bruised body was found in rural Bedford County, Tennessee. He had been strangled to death by "a narrow band-like object placed around his neck." Tr. at 584. Circumstantial evidence introduced at trial revealed that a piece of fiber found on Hauser's pants was identical to the carpet fibers found in the green Buick Skylark that Vretta had rented in Milwaukee; also, a piece of cloth fiber matching Allen Hauser's pant fibers was found on the rear seat of the rented green Buick Skylark. Further, the Skylark's backseat contained bloodstains consistent with Allen Hauser's blood. Results of the criminal investigation into the kidnaping and murders also revealed that fibers from the Vretta's white and orange Volkswagen van were also found on Allen Hauser's shirt and pants; and a hair strand found on Hauser's sock was determined to be "mi-

---

1. Both Allen and Mark Hauser had the same blood type.

croscopically matched" to that of the hair of Vretta. At trial, a forensic pathologist, who examined Allen Hauser's body, testified to a reasonable degree of medical certainty that Hauser probably expired some time after he left the State of Wisconsin. Further, an FBI agent testified that when he interviewed Vretta at his Florida retirement residence on September 24, 1983, Vretta stated he was glad that Hauser had been killed even though the FBI agent had no knowledge as of that time that Hauser was deceased. The agent also testified that Vretta denied ever having been in Elm Grove, Wisconsin.

Vretta raises the following issues on appeal: (1) whether the court erred in allowing evidence of Mark Hauser's death to be received during his trial for kidnaping; (2) whether the court erred in allowing into evidence the threats to Hauser supposedly attributable to Vretta; and (3) whether the court erred in allowing into evidence the fact that Allen Hauser had been "tortured" prior to his death.

## II

### Mark Hauser's Death

Prior to trial, the defense submitted a motion in limine, seeking to exclude from the evidence to be presented at trial, the facts and circumstances of Mark Hauser's death. Defense counsel argued to the district court judge that the issue the government was obligated to prove was whether Allen Hauser was taken from his house voluntarily. Although defense counsel acknowledged the fact that Mark Hauser was strangled was probative for the question of whether Allen Hauser left his home voluntarily, he believed that the prejudicial effect of introducing the facts and circumstances of Mark Hauser's death outweighed its probative value. The attorney concluded that introducing evidence concerning Mark Hauser's death "attempt[s] to make a kidnaping case into a murder case and a kidnaping and would create such a diversion in the jury's mind that their focus is really going to be on the, on the terrible circumstances of what is appar-

ently a very unfortunate and unnecessary death rather than specific elements of kidnaping." Defense counsel stated that "to . . . attempt to cooperate with the government and to avoid the prejudicial impact of Mark's death, I would be willing to stipulate that if Allen Hauser was abducted, that he went along involuntarily."

The government responded to the motion in limine arguing that its case was largely circumstantial and that "there is an awful lot of the circumstantial evidence that the government wishes to offer during the course of this trial that has to do with the identity of Mr. Vretta as being the perpetrator of these acts." Additionally, the government contended that introducing evidence with regard to activities at the residence was necessary to establish motive; in the government's view, the crime may have begun "as a simple house burglary to acquire whatever one could with no one home" but "catapulted itself by the course of events" into a double murder. Moreover, the government argued that it was entitled to introduce the details of Mark Hauser's death because both Mark and Allen Hauser were killed in the same manner; that is, they were both strangled by "a cord around the neck and pulled from behind." Further, the government argued that the evidence "assists the government with respect to defense counsel's anticipated argument that there were no ransom notes with respect to the events that occurred, particularly with respect to Allen Hauser." Finally, the United States Attorney concluded that the evidence from Mark Hauser's death must be admitted "so that the jury has an understanding of what the totality and the interrelationship of the parties are here."

The court rejected the motion in limine because the probative value of the evidence of Mark Hauser's death outweighed its prejudicial effect. Additionally, the district court judge reassured defense counsel that he would exclude evidence that was gruesome and likely to influence the jury.

Under Fed.R.Evid. 403,[2] "[i]t is well settled that evidence is unfairly prejudicial only if it 'will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented....' " *Cook v. Hoppin,* 783 F.2d 684, 689 (7th Cir.1986) (quoting *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir.1985). Evidence is relevant if its exclusion would leave a chronological and conceptual void in the story. *United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). Further, we may find error in a district court's evidentiary decisions only if the "court clearly abused its discretion" in admitting the evidence. *United States v. Peco,* 784 F.2d 798, 800 (7th Cir.1986); *United States v. Rovetuso,* 768 F.2d 809, 815 (7th Cir. 1985) ("A district court has broad authority to control the admission of evidence...."); *United States v. Tuchow,* 768 F.2d 855, 863 (7th Cir.1985).

The evidence at trial indicated that Mark Hauser's murder in all probability occurred shortly before or in the immediate proximity to the time that Allen Hauser returned home. A drab green rusted car, similar to the car rented by Vretta, was observed pulling into Hauser's driveway between 11:30 a.m. and 12:00 noon on September 20, 1983, the date of the kidnaping and murder. It is reasonable to conclude that Mark Hauser was at home at this time as he had a scheduled doctor's appointment at 1:10 p.m. that day, which he failed to keep. Allen Hauser, who left a service station between 12:30 and 1:00 p.m. with Stowe's car apparently returned to his home a short time thereafter as Stowe's car was found parked in the Hauser driveway and the car keys were found on the living room floor.[3] When Allen Hauser's daughter, Michelle, returned home about 3:00 p.m. that day,

she discovered Mark's lifeless body face down on the family room floor, with his feet positioned together and his hands placed behind his back; there were ligature marks on both his ankles and wrists indicating that restraints had been used and later removed. Mark was 6'2" and 250 pounds, and was in all probability strangled to death by a thin strong material, possibly a wire or nylon cord. There were no signs of a struggle in the family room where he was found. On the other hand, the living room was strewn with papers, and blood stains discovered on the carpeting were analyzed and found to be consistent with that of Allen Hauser.

The defendant contends that he offered to stipulate that Hauser did not consent to be taken from his home and thus the evidence of Mark's death was not relevant. However as defense counsel himself admitted at trial in his closing remarks to the jury, Mark Hauser's death was "inextricably intertwined with Allen Hauser's abduction." Tr. October 11, 1984 at 145. Indeed, the evidence concerning Mark's death was relevant to the timing of Allen Hauser's kidnaping and the violence used to restrain and kidnap him. Mark's death was also relevant as it was likely that Hauser was kidnaped and murdered because he was a witness to Vretta's presence in the house near the time of his son's murder. Further, one of Vretta's defenses at trial was that he was not only mentally incapable but also physically incapable of the brutal kidnaping and murder of Allen Hauser. Vretta is a small man, approximately 5'8" in height and weighing 160 pounds. It is probable that because of his smaller size he may have taken Mark by surprise from behind or while Mark was sleeping. Moreover, as testimony concerning the manner of Allen Hauser's death later confirmed, Mark and Allen Hauser

---

**2.** Rule 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**3.** The Elm Grove police noted that they found the car keys in the living room and the car parked on the driveway after responding to the Hauser daughter's call informing them that she had discovered her brother's lifeless body in the family room.

were strangled to death in a similar manner, with a cord pulled around the neck. Thus, the evidence concerning the circumstances of Mark's murder helps to establish that Vretta was entirely capable of committing this brutal kidnaping. We are convinced that the evidence of Mark's tragic death was relevant because to exclude it, "would have left a 'chronological and conceptual void' in the story" of Allen Hauser's kidnaping. *United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). The jury, in reviewing, weighing and piecing together the evidentiary jigsaw puzzle when determining the ultimate question of guilt or innocence, was entitled to a complete and accurate picture of the crime scenario, from the time the green Buick Skylark, rented by Vretta, arrived at the scene of the crime until the kidnaper departed from the Hauser home. This case was based upon circumstantial evidence and " 'circumstantial evidence is of equal probative value to direct evidence.' " *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir.1986) (quoting *United States v. Towers,* 775 F.2d 184, 188 (7th Cir.1985). Since Vretta's defense at trial was that he did not kidnap Hauser, the circumstances surrounding Mark Hauser's death were relevant as they established Vretta's presence in the Hauser's home near the time of Mark's murder, with the kidnaping following immediately thereafter, and that Vretta was capable of accomplishing the kidnaping of Allen Hauser. The defense counsel's proposed stipulation would have left a "sanitized" version of the crime with too many gaps and questions left dangling concerning the crime scenario, thus forcing the jury to speculate.

Moreover, an examination of the record reveals that the government was extremely cautious in its presentation of the evidence, revealing only that quantum of proof absolutely necessary to establish that Mark Hauser's death, as the defense counsel conceded in his closing argument, was "inextricably intertwined" with the kidnaping of Allen Hauser. Furthermore, the government did not dwell on its details, rather it elicited only that testimony detailing that Mark's body was found in the family room, that he had been strangled to death and that there was no sign of struggle or any blood in the family room. Thus, we reject defense counsel's argument, based on *United States v. Ostrowsky,* 501 F.2d 318 (7th Cir.1974), that the evidence of Mark's murder was a "gruesome" and "unnecessary" detail of a person's murder that was only tangentially related to the crime charged in the indictment. We hold, after a review of the record and the application of the controlling case law, that the district court did not abuse its discretion in admitting evidence of Mark Hauser's death.

### Testimony of Threats

■ Vretta next asserts that the trial court erred in admitting Allen Hauser's out-of-court declarations that Vretta had made threats against his life. Specifically, Joseph Rogers, an investigator with the Milwaukee County District Attorney's Office, testified that Hauser had called him during August of 1981 and informed Rogers that Vretta had been making threatening phone calls to him. Harvey Whitehouse, whose wife also invested with Vretta in Hauser's photo developing processing scheme, testified that Hauser informed him that during the summer of 1983 Vretta had thrown a smoke bomb into the Hauser home. Also Paul DeSalvo, Vretta's investigator, testified that Hauser told him that Vretta had threatened to kill him. Kathryn Stowe, a friend of Allen Hauser, further testified that Hauser had mentioned to her on a number of occasions from 1982 through the summer of 1983 that Vretta had been threatening him. Finally, Roberta Hauser, Allen's wife, testified that she spoke with a person on the telephone in the spring of 1983, who identified himself as Sam Vretta and who stated that "terrible things would happen" if he (Vretta, the phone caller) did not get his money back. Immediately thereafter Allen Hauser spoke with Vretta on the Hauser's upstairs phone, during the same telephone conversation, and returned downstairs where he

told his wife, referring to Vretta, "that crazy idiot wants to kill me."[4]

The court initially allowed this testimony in evidence under Fed.R.Evid. 803(3) and 804(b)(5) as an exception to the hearsay rule. The court noted that Fed.R.Evid. 803(3) (state of mind) would allow the admission of this evidence to demonstrate that Allen Hauser was fearful of Vretta and thus Hauser would never willingly leave the State of Wisconsin with Vretta.[5] The court subsequently instructed the jury that it could consider this evidence in determining Hauser's "feelings about Mr. Vretta" as this evidence "may be relevant on the issue of whether or not he voluntarily left Wisconsin with Mr. Vretta." The court also initially determined that this evidence was admissible under Fed.R.Evid. 804(b)(5), the "other exceptions" provision to the hearsay exclusionary rule that allows admission of hearsay statements when the declarant is unavailable to testify. One of the requirements of Rule 804(b)(5) is that the statement is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." After Roberta Hauser testified that she spoke with a man on the phone, whom she recognized as Sam Vretta not only from his identification of himself as

Sam Vretta but also from having heard his voice on previous occasions, and that the man told her "terrible things would happen" if his money was not returned, the trial court noted that one of the requirements of Rule 804(b)(5) was not satisfied since Roberta Hauser's testimony was "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." (Tr. at 408). Thus the court determined that the other hearsay testimony did not meet the rule's requirements.[6] The district court admitted this evidence only under Rule 803(3) to establish the state of mind of Allen Hauser that he would not voluntarily leave his Wisconsin home with Vretta.

■ Vretta argues that the district court erred in admitting evidence concerning threats made against Allen Hauser under the state of mind exception to the hearsay Rule 803(3) since these statements contained facts "remembered or believed" and Rule 803(3) does not include statements "of memory or belief to prove the fact remembered or believed" within the exception to the hearsay rule. Fed.R.Evid. 803(3).[7] The defendant also argues that the evidence was not admissible under Rule

---

**4.** This statement was properly admitted as an excited utterance under Rule 803(2). Vretta argues the government never proved that the person on the phone was actually Vretta since Mrs. Hauser identified the caller as Vretta only because that is how the caller introduced himself. Other evidence introduced at trial concerning Vretta's conduct established that it was most likely Vretta on the phone. Mrs. Hauser testified that it was the same voice that had called on numerous occasions asking for her husband and the telephone records at trial established that Vretta had called Hauser on numerous occasions. Also Vretta stipulated at trial that he sent a letter to Hauser, dated July 18, 1983, that contained the statement "return my money before its too late for you," which was similar to the threat delivered over the phone to Mrs. Hauser. Further, it was clearly established at trial that Vretta's motive to make the threatening call was to induce repayment of his money.

**5.** As mentioned earlier, the defendant argued that this evidence was irrelevant as he was willing to stipulate to the issue of consent.

**6.** Although the court did not specifically state its reasons as to why the hearsay testimony detailing the threats was not as probative as Roberta Hauser's testimony of the threat made directly to her, we are convinced the court believed that Roberta's testimony was more probative as to the defendant's intent to do harm to Hauser than the testimony referring to the threats against Vretta.

**7.** The entire text of Rule 803(3) states:
"Then existing mental, emotional or physical condition. A statement of the declarant's then existing state of mind, emotional, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* unless it related to the execution, revocation, identification, or terms of declarant's will." (Emphasis added).

804(b)(5) as Allen Hauser had a "reputation as a con artist" and thus was not a reliable declarant. While the evidence may very well have been admissible under Rule 803(3) (state of mind), we do not reach this issue since we hold that the statements were admissible pursuant to Rule 804(b)(5).[8]

Rule 804(b)(5) states that:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\*  \*  \*  \*  \*  \*

(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

One of the contested issues at trial was whether the evidence of threats was "more probative" than any other evidence offered as to Vretta's intent to commit the crime. Vretta's defense was that the government could not prove beyond a reasonable doubt he was the person who kidnaped Allen Hauser.[9] As previously noted, defense counsel attempted to establish this theory by presenting character evidence that Vretta was a peaceful man, who was mentally and physically incapable of the brutal kidnaping and murder of Allen Hauser. Vretta's defense counsel further argued to the jury that it made no sense for Vretta to kidnap and kill Hauser since he would then be unable to collect his investment from Hauser. The government successfully portrayed Vretta as a man who became increasingly frustrated in his attempt to recoup his alleged life's savings from Hauser. Initially, Vretta hired a lawyer who obtained a default judgment for him against Hauser. Next, he went to the added expense of hiring a private investigator in an attempt to discover and attach any of Hauser's assets to satisfy the judgment, but to his dismay the investigator was unable to uncover any assets. According to the government's theory at trial, Vretta resorted to numerous threats of violence and vandalism against Hauser and his family, including the telephone threats and smoke bombing of the Hauser's home in summer of 1983. Eventually Vretta's frustration at his inability to recoup his investment from Hauser culminated in the murder of Mark Hauser and the kidnaping and murder of his father, Allen Hauser. The evidence of the threats against Allen Hauser and the smoke bombing of his home rebutted Vretta's defense that he was a peaceful man. Furthermore this evidence rebutted Vretta's argument that it would be illogical for him to kidnap and kill Hauser as he would be unable to collect his investment since it demonstrated Vretta's rising frustration and anger over his inability to recoup his money and that his anger and frustration overwhelmed his judgment leading him to commit these atrocious crimes. Thus, the evidence of the threats was the best evidence available, pursuant to Fed.R.Evid. 804(b)(5), to establish Vret-

---

8. Our silence as to the admissibility of the evidence under Rule 803(3) is not to be construed under any circumstances as disapproval of the district court's submission of these statements under this hearsay rule exception.

9. Vretta's other defense was that the interstate element of the crime of federal kidnaping was missing as Hauser had died before he left Wisconsin.

ta's motive in commiting the crime. Mrs. Hauser's testimony that the man who identified himself as Sam Vretta called and told her "terrible things would happen" if his money was not returned is a piece of the circumstantial evidence puzzle of the escalating conduct of threats made against Allen Hauser and family. This testimony, we repeat, is just one segment of the overwhelming amount of circumstantial evidence against Vretta and were it considered in isolation it would not establish a pattern of escalating threats and conduct on the part of Vretta revealing his rising anger and frustration concerning his inability to recoup his lifetime savings. Thus, the evidence of the threats was the "most probative evidence reasonably available on [the] material issue" of Vretta's motive to commit the crime. See *United States v. Boulahanis*, 677 F.2d 586, 589 (7th Cir. 1982).

Rule 804(b)(5) also states that a statement may be admitted in evidence if the "statement not specifically covered by any of the foregoing exceptions ... [has the] equivalent circumstantial guarantees of trustworthiness" as statements admitted under the other hearsay exceptions. Vretta argues that this evidence is untrustworthy and unreliable as Allen Hauser had a "reputation as a con artist." He further argues that Hauser had a motive to lie about the threats in order to exert pressure on Vretta to impede his collection efforts and to curry favor with the law enforcement officials who were investigating his proclivity for questionable financial activities. The district court judge properly ruled that not only did Hauser actually make the statements but also that the assertions in the statements (that Vretta had actually threatened Hauser) were reliable and trustworthy. A trial judge has considerable discretion, within the parameters of the rules of evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness. See *United States v. Howard*, 774 F.2d 838, 845 (7th Cir.1985); *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979). In this case, Hauser

told a number of people about Vretta's threats toward him, thus lending credibility to the fact that Hauser made the statements concerning the threats. *See Howard*, 774 F.2d at 845 (noting that the defendant made the same statement "not only once, but twice" to witnesses). The defendant speculates that Hauser had a motive to manufacture these threats so as to curry favor with those persons investigating his investment schemes. While Hauser did complain about the threats to Rogers, the Milwaukee County District Attorney's investigator, the record also demonstrates that Hauser related the threats to two private citizens, Kathryn Stowe and Harry Whitehouse, who had no connection at all with any of the investigations of Hauser's financial dealings. It is neither apparent to us nor are we able to comprehend what Hauser might have gained, if anything, from revealing Vretta's threats to the private citizens. Thus the fact that he informed these disinterested third parties of the threats rebuts and contradicts Vretta's argument that Hauser could have been making these statements to gain sympathy from those who were investigating him. *Cf. Howard*, 774 F.2d at 845. Further, Hauser told Rogers, the District Attorney's Investigator, of Vretta's threats in August 1981, just after the threatening phone calls commenced. Also, Hauser's wife testified that just after she received the call from Vretta where he threatened that "terrible things would happen" if his money was not returned, Mr. Hauser spoke with Vretta on Hauser's upstairs phone during the same conversation and returned downstairs where he exclaimed to his wife, in referring to Vretta, "that crazy idiot wants to kill me." The close proximity in time between the statement repeating the threat and the threat itself lends support to the statements' trustworthiness. *United States v. Van Lufkins*, 676 F.2d 1189, 1192 (8th Cir.1982). If Vretta was truly concerned that Hauser lied about the threats, he was free to discredit Hauser and introduce evidence, under Fed.R.Evid. 806, to attack the credibility of the deceased de-

clarant, Hauser.[10] We hold that the experienced and able trial court judge did not abuse his discretion when it found the hearsay statements trustworthy.

The defendant in desperation asserts that the admission of the threat evidence does not serve the interest of justice since the statements lack the circumstantial guarantees of trustworthiness. We have disposed of this contention in holding that the statements were trustworthy. We note that the interests of justice always will be served in admitting reliable, relevant hearsay evidence within the confines of the evidentiary boundaries in our ever never ending search for the truth.

■ The defendant also argues that the government failed to provide adequate notice, as required in Rule 804(b)(5), that it intended to introduce evidence of "death" threats. Prior to trial, the government sent a letter to defense counsel stating that it intended to introduce evidence of threats made by Vretta against the "health and well-being" of Allen Hauser, and included in his letter the names and addresses of the witnesses the government intended to call. Vretta's allegation that he was prejudiced since the specific words "death threat" were not mentioned in the letter is at best described as disingenuous. At trial, Vretta's counsel, during his cross-examination of Rogers, was the first party to ask a witness about the alleged death threats. Further, the notice letter referred to the threats relating to the "health and well-being" of Allen Hauser. The wording of this letter was more than sufficient to notify the defendant of the type of evidence the government expected to introduce and thus provided him with a "fair opportunity to meet" this evidence at trial. Fed.R.Evid. 804(b)(5).

■ The defendant finally contends that the hearsay testimony detailing the prior threats violated his Sixth Amendment right to confrontation. As the Supreme Court stated in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion), the hearsay rules and the Confrontation Clause of the Sixth Amendment "stem from the same root," but the two are not equivalent. *Id.* at 86, 91 S.Ct. at 218. Thus, evidence that is admissible under a hearsay exception may be barred if it violates the defendant's Sixth Amendment right to confront witnesses against him. However, where the government demonstrates the "unavailability of ... a witness ... and ... [makes] a strong 'showing of particularized guarantees of trustworthiness' concerning the statements ..." the evidence satisfies any Sixth Amendment Confrontation Clause challenge. *Howard*, 774 F.2d at 846; *Flewallen v. Faulkner*, 677 F.2d 610, 613 (7th Cir.1982).[11] In this case, taking into consideration that Hauser was unavailable to testify and, as demonstrated earlier in this opinion, that the government clearly established that his statements possessed the requisite guarantee of trustworthiness, we hold that Vretta's Sixth Amendment right of confrontation was not violated when the court admitted the hearsay statements.

### Evidence of "Torture"

■ Vretta's final contention on appeal is that the district court abused its discretion in allowing the forensic pathologist to testify that to a reasonable degree of medical certainty the detached skin on Allen

---

**10.** Federal Rule of Evidence 806 provides:

"When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness...."

**11.** Recently, the Supreme Court decided in *United States v. Inadi,* — U.S. —, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) that the Confrontation Clause does not require the government to demonstrate that a non-testifying co-conspirator is unavailable to testify as a condition for the admission of that co-conspirator's out-of-court statements under Fed.R.Evid. 801(d)(2)(E). The availability of Allen Hauser as a witness is not at issue in this case as he was obviously murdered and therefore was unavailable to testify. Thus we need not decide the impact of *Inadi* on the Sixth Amendment issue presented in this case.

Hauser's foot was probably caused by scalding the foot. On appeal, Vretta characterizes the pathologist's testimony concerning the scalding of Hauser's foot as "evidence of torture." An examination of the record reveals that at trial Vretta challenged the time of Allen Hauser's death.[12] His defense was that if Hauser died prior to leaving the state, the federal prosecutor lacked jurisdiction to pursue the kidnaping charge. In response to this defense placing the time of death in dispute, the government called a forensic pathologist who testified that, based upon the condition of the body when he examined it and assuming that Hauser was driven to Tennessee, Hauser's death occurred sometime after he left the State of Wisconsin. In the course of establishing the foundation for this conclusion, the doctor was allowed to testify as to the condition of the body. The injuries to the body, skin and feet were relevant to establish the foundation for the expert to express an opinion to a reasonable medical certainty as to Hauser's time of death. From our review of the record, the condition of the body was described in medical and antiseptic terms and we have failed to discover any testimony in the record, nor were any statements referred to us in Vretta's brief, that could be even remotely construed as mildly inflammatory in describing the condition of the deceased body. The defendant's contention that the district court abused its discretion in admitting this evidence is without merit.

The conviction of the defendant for kidnaping is AFFIRMED.

---

**12.** On appeal, Vretta failed to renew his challenge to the sufficiency of the evidence establishing that Allen Hauser died after leaving Wisconsin.