**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph MARSHALL,
Defendant–Appellant.**

No. 87–2746.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1988.

Decided Sept. 2, 1988.

As Amended Sept. 15, 1988.

**897**

Jerome Rotenberg, Rosenfeld, Rotenberg, Schwartzman, Hafron & Shapiro, Chicago, Ill., for defendant-appellant.

Laurie N. Feldman, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge,
POSNER, and FLAUM, Circuit Judges.

BAUER, Chief Judge.

The defendant-appellant, Joseph Marshall, appeals the district court's refusal to dismiss his three-count indictment for receiving, concealing, and retaining United States Savings Bonds in violation of 18 U.S.C. §§ 371, 641, 2314, and 2312.[1] We affirm.

## I.

### A.

On October 20, 1983, Marshall was charged by complaint with the 1979 receipt of stolen United States Savings Bonds in Chicago, Illinois. Despite the FBI's efforts to locate Marshall, he remained at large until his surrender on October 28, 1985. He was indicted on November 26, 1985, and moved to dismiss the charges, alleging that the government failed to bring his indictment within the applicable five-year statute of limitations. *See* 18 U.S.C. § 3282.[2] Following a two-day hearing, Judge Williams denied the defendant's motion, holding that the limitations period was tolled from February, 1984, until the time of Marshall's surrender because he had been a "fugitive from justice" during that period within the meaning of 18 U.S.C. § 3290 (the "tolling statute").[3]

Judge Williams concluded that Marshall fled Illinois with the intent to avoid prosecution because he failed to surrender to authorities after learning of his arrest warrant. Marshall denies that he was ever aware of the charges against him. The United States, however, contends that Marshall's mere absence from Illinois, regardless of his intent, is sufficient to toll the statute of limitations under section 3290.

### B.

We have not addressed previously the question whether section 3290's pronouncement that "[n]o statute of limitations shall extend to any person fleeing from justice" requires a showing that the defendant intended to avoid arrest or prosecution. Both the District of Columbia and the Eighth Circuits have held that mere absence from the jurisdiction in which the crime occurred, regardless of intent, is sufficient to toll the statute of limitations. *See Matter of Assarsson*, 687 F.2d 1157 (8th Cir.1982) (citing *King v. United States*, 144 F.2d 729 (8th Cir.1944), *cert. denied*, 324 U.S. 854, 65 S.Ct. 711, 89 L.Ed. 1413 (1945)); *McGowen v. United States*, 105 F.2d 791 (D.C.Cir.), *cert. denied*, 308 U.S. 552, 60 S.Ct. 98, 84 L.Ed. 464 (1939). The First, Second, Fifth, and Ninth Circuits have held that intent to avoid arrest or prosecution must be proved before section 3290 applies and the statute of limitations is tolled. *United States v. Wazney*, 529 F.2d 1287 (9th Cir.1976); *Jhirad v. Ferrandina*, 486 F.2d 442 (2d Cir.1973); *Donnell v. United States*, 229 F.2d 560 (5th Cir.

---

1. On August 31, 1987, Marshall entered pleas of guilty to counts One and Two of the indictment pursuant to a written plea agreement reserving his right to appeal the court's denial of his motion to dismiss. The court dismissed Count Three of the indictment on the government's motion.

2. 18 U.S.C. § 3282 provides:

Except as otherwise provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

3. 18 U.S.C. § 3290 provides:
No statute of limitations shall extend to any person fleeing from justice.

1956); *Brouse v. United States*, 68 F.2d 294 (1st Cir.1933).

The genesis of these divergent views is a single, turn-of-the-century Supreme Court case, *Streep v. United States*, 160 U.S. 128, 16 S.Ct. 244, 40 L.Ed. 365 (1895). There, the defendant, Streep, committed a criminal offense indictable under both state and federal law. Although a timely state indictment was returned against Streep, no federal indictment was brought until after the expiration of the federal statute of limitations. When Streep moved to dismiss the federal charges as untimely, the government produced evidence that Streep had fled to Europe upon learning of his state indictment, but before his federal indictment was returned.

Streep countered with two separate contentions. First, he maintained that the federal statute of limitations could not be tolled if he fled with the intent to avoid only separate state charges. In rejecting Streep's distinction, the Court noted that,

> it is quite clear that any person who takes himself out of the jurisdiction, *with the intention of avoiding being brought to justice for a particular offense,* can have no benefit of the [statute of] limitation[s]. . . .

*Id.* at 133, 16 S.Ct. at 246 (emphasis added). And that,

> in order to constitute "fleeing from justice," within the meaning of section 1045 of the Revised Statutes [now section 3290], it is not necessary that there should be an intent to avoid the justice of the United States; but *it is sufficient that there is an intent to avoid the justice of the State having criminal jurisdiction* over the same territory and the same act.

*Id.* at 135, 16 S.Ct. at 247 (emphasis added). Thus, although the Court held that intent to avoid federal prosecution need not be established, it nevertheless acknowledged that, "the general intention of the defendant in leaving the jurisdiction is material and is an indispensable aspect in considering whether he was, while outside the jurisdiction, a fugitive from justice." *Donnell,* 229 F.2d at 562.

Streep contended next that, because he left for Europe before the initiation of any federal prosecution (i.e. indictment), he could not have "fled from justice" within the meaning of the tolling statute. The Court rejected Streep's argument and held that the tolling statute is applicable whenever "there is a flight *with the intention of avoiding being prosecuted,* whether a prosecution has or has not been actually begun." *Id.* 160 U.S. at 133, 16 S.Ct. at 246 (emphasis added). The Court stated that,

> there can be no doubt that, in this respect, section 1045 [the tolling statute] must receive the same construction that has been given to section 5278 [the extradition statute] by this court, saying: "To be a fugitive from justice, in the sense of the act of Congress regulating the subject under consideration, it is not necessary that the party charged should have left the State in which the crime is alleged to have been committed, after an indictment found, or for the purpose of avoiding a prosecution anticipated or begun, but simply that having within a State committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offense, he has left its jurisdiction and is found within the territory of another. *Roberts v. Reilly,* 116 U.S. 80, 97 [6 S.Ct. 291, 300, 29 L.Ed. 544 (1885) "

*Id.* at 134, 16 S.Ct. at 246.

The government makes much of the Court's statement that the tolling and extradition statutes "must receive the same construction." For the extradition statute has been held consistently to require only proof of absence from the indicting jurisdiction, regardless of the defendant's intent. *See, e.g., Appleyard v. Massachusetts,* 203 U.S. 222, 227, 27 S.Ct. 122, 123, 51 L.Ed. 161 (1906); *Roberts v. Reilly,* 116 U.S. 80, 94, 6 S.Ct. 291, 299, 29 L.Ed. 544 (1885); *United States ex. rel. Jackson v. Meyering,* 54 F.2d 621, 622 (7th Cir.1931); *United States v. Steinberg,* 478 F.Supp. 29, 32 (N.D.Ill.1979). The government argues that *Streep* equated the nonintent-based

standard of the extradition statute with that of the tolling statute. *See Donnell*, 229 F.2d at 565 (Rives, J., dissenting).

Although, the Court's statement lends some support to the government's position, a careful review of the Court's entire opinion will not bear the weight of the government's contention. Taken in context, *Streep* merely indicates that just as flight before the initiation of prosecution requires extradition, so too does preindictment flight trigger the tolling statute. *Streep* does not implicate the extradition statute's nonintent-based standard under the tolling statute.

The validity of this statement is clear from the context in which the Court discussed the extradition statute. In support of its holding and immediately following its statement that the tolling statute is triggered by "flight with the intention of avoiding being prosecuted, whether a prosecution has or has not been actually begun," *id.*, 160 U.S. at 133, 16 S.Ct. at 246, the Court stated:

> and there can be no doubt that, *in this respect*, section 1045 of the Revised Statutes [the tolling statute], must receive the same construction that has been given to section 5278 [the extradition statute]....

*Id.* at 134, 16 S.Ct. at 246 (emphasis added). The Court's reference to the extradition statute is modified by the phrase "in this respect." And that phrase clearly refers to flight before the initiation of prosecution and not the distinct question of whether intent to avoid prosecution need be shown under the tolling statute. For in the very next paragraph, the Court explicitly recognizes that intent to avoid prosecution is relevant and necessary in order to invoke the tolling statute, without any reference to the extradition statute.[4] Indeed, if the Court viewed intent as irrelevant under the tolling statute, it could have disposed of Streep's claim without any discussion of intent. It was undisputed that Streep was absent from the indicting jurisdiction during the running of the statute of limitations; that fact alone, under the government's reading of *Streep*, would have tolled the statute of limitations. Instead, however, the Court held that flight with the intent to avoid either state or federal prosecution is required to implicate the tolling statute.

Moreover, the government's reading of *Streep* is incompatible with the purpose of the tolling statute. The extradition provisions, unlike the tolling statute, are "in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several states." *Appleyard v. Massachusetts*, 203 U.S. 222, 227, 27 S.Ct. 122, 124, 51 L.Ed. 161 (1906). The phrase "fugitive from justice," as there contained, then, cannot be understood in a literal sense. *Id.* at 230, 27 S.Ct. at 124 (citing *Hibler v. State*, 43 Tex. 197, 201 (1875)). The sole purpose of the statute is "to secure the return of persons who had committed crime within one State, and had left it before answering the demands of justice," *Id.* (citing *State v. Richter*, 37 Minn. 436, 438 (1887)), in order that the indicting State might secure the prompt and efficient administration of its criminal laws.

Conversely, the statute of limitations, along with its companion tolling provisions, is designed to balance two competing interests. The statutes are intended to allow

---

**4.** The government points to *Appleyard v. Massachusetts*, 203 U.S. 222, 27 S.Ct. 122, 51 L.Ed. 161 (1906), as further proof in support of its contention that *Streep* intended to equate the nonintent-based standard of the extradition statute with that of the tolling statute. But once again, careful review of the Court's opinion does not support the government's contention. Although the Court reaffirmed its earlier holding that like words in the tolling and extradition statutes must be given like construction, *id.* at 229–30, 27 S.Ct. at 124–25, it did so only in support of the proposition that "the fact that [the defend- ant] has not been within the State since the finding of the indictment is irrelevant and immaterial" to application of the extradition statute. *Id.* at 229, 27 S.Ct. at 124 (quoting *Roberts v. Reilly*, 116 U.S. 80, 97, 6 S.Ct. 291, 300, 29 L.Ed. 544 (1885)). Thus, although *Appleyard*'s pronouncement lends support to the government's position, taken in context, it simply reiterates *Streep*'s holding on preindictment flight, and does not implicate the extradition statute's nonintent-based standard in a section 3290 inquiry.

the government sufficient time to investigate and prosecute criminal conduct, while shielding the defendant from the burden and jeopardy of confronting distant offenses. *United States v. Gonsalves,* 675 F.2d 1050, 1052 (9th Cir.1982); *United States v. Di Santillo,* 615 F.2d 128, 135 (3rd Cir.1980); *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 859–60, 25 L.Ed.2d 156 (1970). The tolling statute reflects the congressional belief that where the defendant impedes the discovery and prosecution of his criminal conduct by "fleeing from justice," his right to avoid prosecution for distant offenses is diminished while the government's need for additional discovery time is strengthened. *See Gonsalves,* 675 F.2d at 1052 (citing 104 U.Pa.L.Rev. 1111, 1113 (1956)). There is insufficient justification, however, for disregarding the defendant's right of repose where he openly leaves the indicting jurisdiction or relocates his home while remaining accessible to discovery and prosecution without the intent to avoid arrest or prosecution. *See Donnell,* 229 F.2d at 564. Application of a nonintent-based standard unduly trammels the defendant's rights by failing to preserve the balance of two competing interests. Thus, we conclude that the defendant's intent to avoid arrest or prosecution must be proved in order to trigger the tolling provisions of Section 3290.

## II.

■ To invoke the tolling statute, then, the government must show that Marshall left Illinois with the intent to avoid arrest or prosecution by a preponderance of the evidence. *See Gonsalves,* 675 F.2d at 1054. *Cf. Lego v. Twomey,* 404 U.S. 477, 486–89, 92 S.Ct. 619, 625–27, 30 L.Ed.2d 618 (1972) (government need only prove that defendant's confession was voluntary by a preponderance of the evidence). That intent may be inferred where the defendant fails to surrender to authorities after learning of the charges against him. *United States v. Catino,* 735 F.2d 718, 722 (2d Cir.1984); *Matter of Assarsson,* 687 F.2d 1157, 1161–62 (8th Cir.1982); *United States v. Bal-*

*lesteros–Cordova,* 586 F.2d 1321, 1323 (9th Cir.1978).

■ At the hearing below, FBI Special Agent Michael Konkol testified that he spoke with Marshall's sister, Patricia Owens, at her home on December 28, 1983, and informed her of Marshall's pending arrest warrant. Konkol testified that when he spoke with Owens again on January 31, 1984, she admitted that two weeks earlier she had informed Marshall that he was wanted by the FBI. Marshall hung up when Owens advised him to turn himself in.

Konkol also testified that he spoke to Ann Marshall, the defendant's estranged wife, on February 6, 1984, and informed her of Marshall's arrest warrant. Ann Marshall told Konkol that she expected the defendant to call within a few days because February 7 was one of their children's birthday. According to Konkol, when he spoke to Ann Marshall again on February 9, 1986, she stated that she had spoken with Marshall and had informed him of the outstanding warrant.

Both Owens and Ann Marshall subsequently testified at the hearing. Owens testified that during the December 28, 1983 meeting with Konkol, she was told that the FBI wanted to talk to Marshall and that he should contact Konkol, but that Marshall "did not have a problem" and that the FBI only wanted to question him about his associates. Ann Marshall testified that during the February 6, 1984 meeting with Konkol, he never informed her of Marshall's warrant and she denied speaking with Marshall on either February 7 or 8. She denied telling Konkol that Marshall had telephoned on one of those two dates or that she had ever informed Marshall of his warrant.

Judge Williams credited the testimony of Agent Konkol, finding that the defendant had been informed of his pending arrest warrant by Ann Marshall in February, 1984. Because the question of Marshall's intent is one of fact, our review of the district court's decision is limited by Federal Rule of Civil Procedure 52(a), which provides that such findings cannot be dis-

turbed unless clearly erroneous. *Andre v. Bendix Corp.*, 841 F.2d 172, 176 (7th Cir. 1988). Thus,

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have· weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) (citations omitted).

We are hesitant to conclude that Judge Williams's assessment of the facts was clear error. Her determination relies heavily upon an evaluation of the witness's credibility, perhaps the quintessential function of any factfinder. Judge Williams concluded explicitly that after viewing Ann Marshall's testimony, she "was not credible." That determination is particularly important where the defense and prosecution witnesses gave conflicting testimony about the very same conversations. Moreover, the district court's findings are corroborated strongly by additional evidence that the defendant actively sought to conceal his whereabouts after commission of the crime, thereby indicating his intent to avoid prosecution.[5] Judge Williams's conclusion was not clearly erroneous.

### III.

█ Finally, the defendant challenges the admissibility of Agent Konkol's hearsay statements regarding the substance of his conversation with Ann Marshall. Federal Rule of Evidence 803(24) provides that hearsay will not be excluded if it is

> a statement not specifically covered by any of the forgoing exceptions but having equivalent circumstantial guarantees

of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Marshall again confronts a steep challenge in attempting to persuade us that the district court's ruling should now be overturned. We will reverse evidentiary determinations only where the district court commits a clear abuse of discretion. *See United States v. Peco*, 784 F.2d 798, 800 (7th Cir.), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Our hesitance lies in the court's proximity to the evidence and its unique ability to assess questions of credibility. *See United States v. Vretta*, 790 F.2d 651, 659 (7th Cir.), *cert. denied*, 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986).

Marshall's primary contention is that Konkol's testimony lacked "circumstantial guaranties of trustworthiness" as required under Rule 803(24) because both Ann Marshall and Patricia Owens were embarrassed and upset by Konkol's visits to their homes and offices, and, therefore, "likely" lied to him about informing Marshall of his pending arrest warrant in order to avoid further contact with Konkol. The defendant now maintains that "[i]t is reasonable to assume that [the witnesses] felt by telling the FBI that [they] had relayed their message to [the defendant], the agents would no longer bother [them] as to the defendant's whereabouts." He contends also that the existence of animosity between the defendant and the witnesses makes "it reasonable to assume that the two would say things

---

**5.** After commission of the crimes, the defendant disappeared without a discernible trace. He left the locations where his co-conspirator had reached him. He registered his home phone under an alias. He left his wife. He did not even tell his family members where he was located. His sister could not call him but had

to await his calls to talk to him. He arranged for his Veteran's Administration disability checks to be sent to the address of family members and met his sister at a Wimpy's fast-food restaurant to retrieve them from her. Nor did he respond to business cards and messages left with his wife by FBI Agent Konkol.

that were detrimental to the defendant" whether true or not.

Although the record indicates that the witnesses were concerned about Konkol's visits, there is no support for Marshall's speculation that they "probably" lied to Konkol. Both Patricia Owen and Ann Marshall testified at the hearing, yet neither offered the explanation which the defendant now suggests. Instead, they refuted Konkol's testimony and denied ever informing Marshall of his warrant. Moreover, if the witnesses ever had a motive to lie, it was strongest during the hearing in order to help their brother and estranged husband. Indeed, Judge Williams concluded that Ann Marshall did just that. The district court did not abuse its discretion in admitting Konkol's testimony. The judgment of the district court is

AFFIRMED.