**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**JOSE MONCAYO, Defendant**

Crim. No. 1993-0099

District Court of the Virgin Islands

Div. of St. Croix

October 21, 1994

DAVID L. ATKINSON, ESQ., AUSA, Office of the United States Attorney, Christiansted, St. Croix, U.S.V.I. *for the Government*

THURSTON McKELVIN, ESQ., F.P.D., MELODY WALCOTT, ESQ., A.F.P.D., Office of the Federal Public Defender, Christiansted, St. Croix, U.S.V.I. *for the Defendant*

MOORE, *Chief Judge*

## MEMORANDUM OPINION

Before the court is defendant Jose Moncayo's Motion To Dismiss For Prosecutorial Delay. The prosecution responded and a hearing on this matter was held on August 24, 1993, and continued on August 25, 1993. For reasons stated below the motion is Denied.

### I. Facts and Procedure.

Jose Moncayo is charged in a three-count information, filed on June 14, 1993, with two counts of aggravated rape and one count of statutory rape. The information alleges that the acts of illegal sexual intercourse were committed sometime between May 1, 1985 and February 6, 1986; between May 1, 1985 and January 30, 1988; and on or about January 30, 1988, respectively.

On April 29, 1988, a warrant was issued by this Court on the application of Officer Ramon-Cruz, a Virgin Islands Police Officer, for the arrest of Jose Moncayo.

At the hearing, defendant's son, Jose Moncayo, Jr., ("Jose Jr.") testified that on March 4, 1988, the Defendant came to the home where he resided with his sister Monica Moncayo and his mother. Jose Jr., who was alone in the house at the time, asked his father to leave, reminding him (defendant) that he was subject to a restraining order to keep away from his mother's residence. The defendant refused to leave and a fight ensued, during which the defendant pulled a knife and slashed his son twice across the chest. According to Jose Jr., he again asked his father to leave, who refused until Jose Jr. said he was going to file charges with the police, in response to which the defendant fled into the bushes.

Jose Jr. testified that he called the police and reported the fight and stabbing, giving the police information to assist them in locating the defendant. Jose Jr. further testified that shortly after the knife incident on March 4, 1988, he learned that his sister had been molested by their father, and that the defendant had left the island with the assistance of an old family friend, Mr. Angel Montanez. Jose Jr. stated that he communicated with all his father's relatives in New York, where the defendant had likely gone, and told them about his fight with his father.

Next, Mr. Montanez testified that he is an old friend of the defendant and the family, and that he drove the defendant to the airport on March 5, 1988. According to Mr. Montanez that was the last time he saw the defendant until May, 1993. Mr. Montanez further testified that over the past five years he would receive occasional calls from the defendant, but the defendant never divulged his address or gave him a number at which he could be reached.

Lieutenant Secuindino Ramon-Cruz, of the Virgin Islands Police Department, then testified that the initial report of the illegal sexual conduct was made on April 8, 1988. The victim, Monica Moncayo, was examined by a doctor who reported that her hymen had been torn and scarred over. Officer Ramon-Cruz testified that he knew the defendant, Jose Moncayo, on sight, and initially searched for him in bars, at the ball-park, and other known hang-outs of the defendant. He testified that he caused a warrant to be issued on April 29, 1988 for the arrest of the defendant. His efforts to locate the defendant in the Virgin Islands proved fruitless, and the warrant was given to the United States Marshal Service office in St. Croix, to begin a search for the defendant on the United States mainland, specifically New York.

Deputy U.S. Marshal Paula Gormley, in New York City ("DUSM Gormley") who was assigned to the case on January 6, 1992, testified as to the efforts of the Marshal Service to locate the defendant. DUSM Gormley testified that all the leads to the defendant's relatives in New York were followed with little positive results. For example, on May 24, 1990, the predecessor agent on the case interviewed two of the defendant's relatives on the list provided by the Virgin Islands Police Department, who

stated they had no knowledge of the defendant's whereabouts and had not seen him in three years.

On July 7, 1991, DUSM Gormley learned that the defendant had resided with his nephew Hector Camacho, an officer with the New York Police Department ["NYPD"] up until May 24, 1990, the date on which the defendant's other New York relatives were interviewed. DUSM Gormley testified that the day after being assigned the case, she and other Deputy Marshals visited Detective Camacho, at the 90th Precinct in Brooklyn. According to DUSM Gormley, Detective Camacho admitted that the defendant had resided with him until sometime in 1990 and had received mail there at that time. Camacho, however, denied knowledge of the defendant's current whereabouts. Camacho gave the Deputy Marshals information about other family members of the defendant who resided in the New York area. DUSM Gormley testified that Camacho told her he knew the police were looking for his uncle, and had told his uncle (defendant) that he would help him to surrender, if this was his uncle's wish.

On January 9, 1992, according to the testimony of DUSM Gormley, Detective Camacho was contacted to set up a meeting with Camacho's mother, Josefa Camacho. Gormley reported and testified that during that conversation Camacho stated with respect to the defendant "he's in the area and my mother would have more information." According to Gormley, the subsequent interview with Josefa Camacho revealed that the defendant had stopped by Josefa's home on Christmas Eve for a few drinks. Detective Camacho denied prior knowledge of the defendant's visit to his mother's home. DUSM Gormley stated that Josefa Camacho informed her that the defendant would call her on occasion, but would never give his location. At that time, DUSM Gormley stated both Detective Camacho and his mother, Josefa Camacho were advised of the harboring act, and both still denied knowledge of the defendant's current whereabouts.

DUSM Gormley stated that the Internal Affairs for the New York City Police Department was informed of Detective Camacho's involvement with a known fugitive. Camacho again denied knowledge of the defendant's whereabouts in a subsequent interview conducted before detectives from Internal Affairs for NYPD and

DUSMs. Other lines of investigation, including but not limited to a FBI check and a check with the Department of Motor Vehicles ("DMV"), proved fruitless. All other leads became dead-ends, and in January 1993, the case was closed in the Southern District of New York. DUSM Gormley testified that though the case was closed, when she received an inquiry from Jose Jr. in late January 1993, she made another DMV check. This last check revealed that in February of 1993 a Jose Moncayo had obtained a license, giving an address at 1008 Summit Avenue, Apartment A-2, Bronx, New York, where he was later arrested on May 5, 1993.

The defendant presented no evidence, but in his motion to dismiss, he submits that from or about the time of his departure from St. Croix, he moved to the Bronx, New York. Defendant states he worked there as a doorman and security guard from at least 1990. He contends that he resided at 1008 Summit Avenue, Apartment A-2, Bronx, New York, and that he neither lived nor worked under an assumed name, during this entire period of time with then wife, Belgica Moncayo.

Defendant argues that the government's failure to apprehend him from April of 1988 until May of 1993 demonstrates a lack of due diligence in their prosecution of this case, resulting in an unreasonable delay of more than five years between the offense and formal charges. Defendant argues that this lengthy delay allowed the meaning of events, details and circumstances at the time of the alleged acts to cloud and fade. Indeed, defendant points out that more than eight years have lapsed from the first criminal act charged to the time of apprehension. Defendant asserts that this fading of memories as to the circumstances has prejudiced the defendant's case.

Additionally, the defendant argues that the staleness of the evidence is a serious problem to his defense. Specifically, the defendant argues that the examining physician "will no doubt have difficulty recalling any statements or actions that may prove significant" with respect to the victim's state of mind at the time of the reporting of the incidents. For these reasons, and for the reason raised by the Court, sua sponte, that the statute of limitations on this action appears to have expired, the defendant argues that the action should be dismissed.

## II. Discussion

### A. *The Law*

■ Generally, the limit on pre-accusation delay is set by the statute of limitations. In this case the limitation period, as established by 1A V.I. Code Ann., tit 5, § 3541(a)(2) is three years. Pursuant to 5 V.I.C. § 3541, prosecution of the defendant would be barred unless commenced within three years after the alleged offense was committed. Section 3541 provides that:

Time for Commencement of criminal action
(a) A criminal action shall be commenced within the following periods:

(1) For murder, embezzlement of public moneys, and the falsification of public records, there is no limitation of the time within which a prosecution shall be commenced.
(2) *For any felony other than specified above, action shall be commenced within three years after its commission.*

(b) If the defendant is out of the Virgin Islands when the offense is committed, the information may be filed within the term herein limited after his coming within the Virgin Islands, *and no time during which the defendant is not an inhabitant of, or usually resident within, the Virgin Islands is a part of the limitation.*
(c) *Nothing in this section extends to persons fleeing from justice.*

■ In this case the information was filed on June 14, 1993, more than three years after the alleged commission of the acts constituting the crime. Unless the limitation period was tolled by the application of subsections (b) or (c) of 5 V.I.C. § 3541, under the facts of this case, the limitation period for the crimes committed expired on or about January 30, 1991. The record shows that the defendant was absent from the jurisdiction for the greater part of the five years since the alleged commission of the illegal acts. Whether the defendant's absence from the jurisdiction constitutes "flight from justice" so as to toll the limitation period must be proved by the government by a preponderance of the evidence. U. S. v. Marshall, 856 F.2d 896, 900 (7th Cir. 1988).

However, "though statutes of limitations provide the primary guarantee against bringing overly stale criminal charges, . . . the

140

statute of limitations does not fully define a defendant's rights with respect to events occurring prior to indictment." U.S. v. Marion, 404 U.S. 307, 322 & 324, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). In Marion, the Supreme Court stated that the Due Process Clause of the Fifth Amendment affords limited protection against pre-indictment delay, and would require dismissal if it were shown that the pre-indictment delay: (1) caused substantial prejudice to the defendant's right to a fair trial and (2) that the delay was an intentional device to gain tactical advantage over the accused. See, Marion, 404 U.S. at 324.

The test for determining a Fifth Amendment Due Process violation was clarified by the Supreme Court in United States v. Lovasco, 431 U.S. 783, 792, 97 S. Ct. 2044, 2049, 52 L. Ed. 2d 752 (1977). In making the Due Process inquiry, Lovasco requires courts (1) to determine whether the defendant has suffered actual substantial prejudice due to pre-indictment delay; and (2) to consider the Government's reasons for the delay and whether the length of the delay, when balanced against the reasons for the delay, "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." Lovasco, 431 U.S. at 789.

██ Both prongs of the Lovasco test involve a double inquiry. In applying the first part of this two-part test, the court must determine whether the defendant has proved actual prejudice, and whether the prejudice is substantial, that is, the prejudice to the defense must meaningfully impair the accused's ability to defend himself. Application of the second part of the Lovasco test requires the court to consider the government's reasons for the delay and to determine whether the prosecution "deviated from elementary standards of 'fair play and decency.'" Lovasco, 431 U.S. at 795. For example, was the delay in returning formal charges intentional, demonstrating a total lack of diligence or for some other improper reason?

Defendant contends that the five year delay before the filing of the Information was "unnecessary," demonstrates "intentional foot-dragging" by the prosecution, and resulted in prejudice to his defense.

## B. *Analysis*

The court has identified the threshold inquiry in this matter as whether the statute of limitation on the offenses the defendant has been charged with has expired to bar prosecution of this case. In answering this question the court must first determine what acts, the filing of an information or the issuance of an arrest warrant within the limitation period, constitute the "commencement" of a criminal action to toll the limitation statute under Virgin Islands law.

██ Counsel for the government argues that where a criminal limitation statute does not provide specifically for the action to be commenced with the return of an indictment or the filing of an information, the action is "commenced" for purposes of the statute of limitation with the issuance of an arrest warrant found on probable cause. The Court agrees, and concludes that the limitation period in this case was tolled by the issuance of the arrest warrant and, under the facts of this case, its reasonably prompt execution. The Virgin Islands statute is silent on what act, specifically, the return of an indictment or filing of an information, or the issuance of an arrest warrant, would commence the prosecution of a crime. Though generally,

> the finding of an indictment or the filing of an information is the first step in a criminal case . . . when, as is usually the case there are preliminary proceedings, the prosecution is commenced and the statute is tolled at the time a complaint is laid before a magistrate and a warrant of arrest is issued.

21 Am. Jur. 2d, Criminal Law, § 230, p.417 (collecting cases). Here, the arrest warrant, issued on April 29, 1988 constitutes the commencement of the action. Therefore, the almost five-year period beginning on March 5, 1988 when the defendant left the jurisdiction, knowing he had committed a felony, the assault of Jose Jr., is excluded from the limitation period for the crimes charge in the information under the provisions of 5 V.I. C. § 3541(a)(2). In short, Defendant's deliberate flight from the jurisdiction on March 5, 1988 serves to toll the statute of limitation.

██ The Court turns now to defendant's argument that the Government's failure to apprehend him before May 1993 was due to a total lack of diligence and thus constitutes an unreasonable

142

delay in the prosecution of these charges. It is beyond question that "possible prejudice is inherent in any delay." See Marion, 404 U.S. at 322, 324. But not "every delay-caused detriment [operates to] abort a criminal prosecution." *Id.* at 342-325. However, as the Supreme Court has oft noted "delay" between formal accusation and trial must be "unreasonable." *Id.* The defendant claims that the delay in the prosecution of this action was "unreasonable" in that it has "impaired" his defense by the dimming of memories and the "loss of [exculpatory] evidence." The inability of a defendant to adequately prepare his case has been identified as the "most serious form of prejudice" a defendant may demonstrate in that it "skews the fairness of the entire system."

Determining the "reasonableness" of the delay is fact-dependent. The defendant carries a heavy burden of persuasion. Defendant claims that the perceptions, "thoughts and feelings" of the victim at the time are forever lost to the jury and works a substantial prejudice to his defense. At this point of the proceedings, the defendant's claim of substantial prejudice is at best speculative.

It is axiomatic that some prejudice may result from even the shortest of delay. In addressing this claim, the court does so with the admonition of the Supreme Court in mind, that "courts are not free to abort criminal prosecution simply because they disagree with the prosecutor's determination as to the appropriate time for initiation of prosecution." See Lovasco, 431 U.S. at 790. For this reason, dismissal of the prosecution of cases on the basis of pre-indictment or pre-accusation delay is generally not favored.

■ The evidence presented does not point to a lack of due diligence or bad-faith delay by the prosecution. To the contrary, there is overwhelming evidence to support the conclusion that the defendant was evading the process of the courts. The testimony of DUSM Gormley, supported by the record introduced into evidence, shows that defendant was actively avoiding apprehension. If the court were to credit the statements of defendant's relatives, defendant would visit or call his relatives but would leave no telephone number or forwarding address where he may be reached. The record reflects the substantial efforts made in 1990, 1991 and 1992 by the NYPD to apprehend the defendant. Indeed,

on one occasion, it would appear that the Defendant, warned by his relatives who were visited by officers of the NYPD, avoided apprehension by less than a day, by leaving the home of the relative who had not yet been contacted by the police officers. The evidence points to the deliberate intent by defendant to avoid being brought to justice, and not to a gross lack of diligence or bad-faith delay by the prosecution. The defendant, in succeeding for five years to avoid prosecution for the crimes charged, forfeited his right not to be prosecuted on a stale claim. Accordingly, and for the additional reasons stated on the record, the Information shall stand, and defendant's motion to dismiss for prosecutorial delay is denied.

## ORDER

Before the court is the Defendant Jose Moncayo's motion to dismiss for prosecutorial delay.

Upon consideration of the Government's response, the arguments of counsel and the testimony adduced at the hearing held on this matter, and in accordance with the Memorandum Opinion filed on even date herewith, it is hereby

ORDERED that the Defendant motion to dismiss is DENIED.[1]

---

[1] A draft of the opinion was inadvertently filed in August of 1993. This Order and accompanying Memorandum replace that draft and have been executed as of October 20, 1994, effective as of August 25, 1993.