**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ruben PULIDO, Defendant–Appellant.**

No. 94–3094.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1995.

Decided Nov. 2, 1995.

Brenda Atkinson, Asst. U.S. Atty., Duane J. Deskins (argued), Office of United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for U.S.

Robert A. Novelle, Joel A. Whitehouse (argued), Serpico, Novelle & Navigato, Chicago, IL, for Ruben Pulido.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

The appellant, Ruben Pulido, was arrested in Chicago, Illinois on November 17, 1993 after attempting to acquire cocaine from Mario Lopez, an associate who, unbeknownst to Pulido, was cooperating with the government. On March 16, 1994, a federal grand jury returned a two-count indictment against Pulido. Count I of the indictment charged him with conspiracy to distribute cocaine during the period from December 1992 to July 12, 1993, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Count II, stemming from the November 17, 1993 transaction that led to Pulido's arrest, charged Pulido with an attempt to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. At his arraignment on March 23, 1994, Pulido entered a plea of not guilty to these charges.

Following a two-day trial May 16–17, 1994, a jury convicted Pulido on both counts of the indictment. On August 25, 1994, the district court sentenced Pulido on each of the counts to 151 months imprisonment, to be followed by five years of supervised release. The terms of imprisonment and the periods of supervised release were to run concurrently. The court also imposed a fine of $4,000 and a special assessment of $100. Pulido appeals his conviction, challenging the evidentiary rulings of the district court, the court's refusal to sever Counts I and II, the sufficiency of the evidence, and the constitutionality of the cocaine conspiracy statute. We AFFIRM.

## I. BACKGROUND

At the time of his arrest in 1993, Ruben Pulido was three days short of his fifty-fifth birthday and had lived his entire adult life in Chicago, Illinois. The father of three grown children, he was a self-employed candlemaker who conducted a modest business under the name Frontier Candles. The evidence at Pulido's trial, including testimony from Mario Lopez (the associate whose cooperation with the government led to Pulido's arrest), established that Pulido had been part of an extensive drug distribution network during the six months prior to his arrest.

### A. Conspiracy to Distribute Cocaine: December 1992–July 1993

The conspiracy in which Pulido took part involved numerous individuals and lasted from December 1992 until the middle of July 1993. The ringleader of this conspiracy was Esteban Zapata. After coming to Chicago, Illinois in the fall of 1992 as a fugitive on a drug-trafficking charge,[1] Zapata moved into an apartment with his cousin, Jose ("Tito") Santamaria, and Mario Lopez on South Drake Avenue ("the Drake Avenue apartment"). Zapata and Santamaria, who had previously joined and participated in drug dealings, resumed their illegal activity. Zapata was able to obtain significant amounts of cocaine from another cousin, Marco Zapata, who lived in Texas and had connections with a Mexican source named Marco Rodriguez. According to the testimony of Lopez, regular shipments of cocaine were delivered to members of the conspiracy in the Chicago, Illinois area beginning in late November of 1992.

Mario Lopez testified that he helped Zapata pick up and distribute cocaine, in return for a percentage of Zapata's profits from the sale of that cocaine. Zapata, who had no driver's license, would typically send Lopez to pick up the cocaine at locations northwest of Chicago near Elgin, Illinois. Santamaria

sometimes accompanied Lopez on these missions. Originally, Lopez received cocaine from a person named Melvin, but later dealt exclusively with "Cuco." Cocaine changed hands at these meetings, but cash did not. Payment was not expected for a period of between several days and two weeks. After picking up the cocaine, Lopez would return to his girlfriend's apartment in Chicago, where he would place a call to Zapata or Santamaria at the "Siboney Lounge" or at the Drake Avenue apartment. Zapata would then give instructions regarding the quantity of cocaine to be delivered to him personally as well as to his various distributors, including Pulido.

Santamaria was in charge of delivering Pulido's portion of these cocaine shipments. The procedure was for Pulido to drive his van in front of the building where Lopez' girlfriend resided, and for Santamaria to transfer the drugs into the van as quickly as possible. Again, the cocaine was supplied on credit. Pulido would usually meet Santamaria several days later to make payment. The cash received by Santamaria would then be counted by Zapata and his cohorts, who now included Santamaria, Mario Lopez, and an individual named Rolando Lopez.[2]

Mario Lopez did not deal directly with Pulido during the period from December 1992 to March 1993. Nevertheless, Lopez testified that he was familiar with Pulido's role as a distributor for several reasons: Santamaria told him about his dealings with Pulido, Lopez helped to count the money collected from distributors (including the cash collected from Pulido), and Lopez could observe Pulido's pick-ups first-hand because they took place in front of his girlfriend's residence. Lopez stored the cocaine at this location and handed it to Santamaria for delivery to Pulido. Lopez could see Pulido's van as it pulled up in front of the building for drug pick-ups.

When Zapata had collected payment from his distributors, including Pulido, he would

---

1. The record does not reveal the precise nature of the charge against Zapata or the jurisdiction from which he was fleeing. However, according to the government's Presentence Investigation Report, Zapata was "a fugitive on a drug trafficking charge" when he "returned" to Chicago.

2. Rolando Lopez, who was not related to Mario Lopez, began to work for Zapata shortly after the first shipments of cocaine arrived.

contact his suppliers in Texas and their intermediary, Cuco. Mario Lopez and Santamaria would then be dispatched to deliver the money to Cuco at the same locations used for delivery of the cocaine. On these occasions, Cuco would often tell Lopez and Santamaria when the next shipment was due (usually within several days).

According to Mario Lopez, Zapata received deliveries of cocaine about once every two weeks during the period between December 1992 and March 1993. Zapata supplied Pulido with cocaine on eight to ten separate occasions using the *modus operandi* described above, with Pulido receiving at least five kilograms from each shipment.

This cycle of delivery, distribution, and payment was broken in March of 1993 when Zapata's suppliers cut him off, claiming that they had been "shorted" in the amount of $300,000. Zapata disputed this claim and tried to persuade his suppliers to resume shipments. Marco Rodriguez, one of Zapata's suppliers, came to Chicago in late April 1993 to try to ascertain who was actually responsible for the allegedly missing money. Meanwhile, Pulido and the other distributors were anxious to do business and checked in periodically with Zapata, Santamaria, Rolando Lopez, and Mario Lopez at the Drake Avenue apartment. Thus, according to the government, the conspiracy continued even after the drug supply dried up in March of 1993.

A court-approved wiretap [3] of Zapata's telephone commenced on April 22, 1993, after deliveries of cocaine had ceased on account of the dispute between Zapata and his suppliers. Using this court-approved wiretap, the government intercepted conversations between Zapata and Pulido, Santamaria and Pulido, Mario Lopez and Pulido, Zapata and other distributors, and Zapata and his suppliers. Many of these conversations had to be translated from Spanish into English and then transcribed before they could be presented to the jury at Pulido's trial. Monica Alvarez, the FBI translator who worked on these translations, testified that she was able to identify most of the speakers (a) by using the logbook kept by FBI agents while monitoring the calls, (b) by relying on a speaker's self-identification (e.g., "It's Ruben"), or (c) by comparing "unidentified" voices with previously identified voices. Nevertheless, Alvarez admitted under cross-examination that she was unable to identify all of the instances in which Pulido spoke until Lopez assisted with the process of voice identification. Lopez testified that he listened to the tape recordings and that he could identify who was speaking on them because he had been familiar with the speakers. Lopez also testified that he reviewed the transcripts prepared by Ms. Alvarez and the FBI and that the final voice identifications on those transcripts were accurate.

In these recorded conversations, the speakers use terms such as "family," "donkey," and "work," all of which, according to Lopez, were coded references to cocaine. The following exchange, by way of illustration, occurred during the period after Zapata's suppliers cut him off, when Pulido and others were checking with Zapata regularly to see if or when shipments might resume:

*May 3, 1993* Pulido called Zapata and asked "what does the family say?" Zapata responded, "the family . . . told me they are just barely going to get a ticket. . . . A little while ago they told me. . . . [m]aybe by Wednesday or so." Pulido replied "Okay. Call me as soon as the family arrives to go see them, to visit them."

*May 5, 1993* Pulido called and told Zapata that "Mother's Day is coming. . . . [a]nd it turns out that . . . this woman isn't coming." Zapata replied: "No . . . she doesn't come." Zapata elaborated that "she" was supposed to arrive but had not yet arrived. Pulido then asked: "it'll come at—at any time, then?" Zapata responded "Yes." Pulido then said he would be sure to "bring the mariachis . . . for Mother's Day." Pulido concluded by saying "You understand? Ah, ok. Well, then, as soon as he arrives call me right away."

---

3. The record contains little detail concerning the wiretap authorization. Monitoring of the telephone line at the Drake Avenue apartment continued until mid-July 1993, when Zapata, Santamaria, and Rolando Lopez were murdered.

*May 7, 1993* Pulido called Santamaria and asked "What does the woman say? Is she going to come here for Mother's Day or what?" Santamaria replied that he thought so. Pulido replied that they would have to celebrate "her" arrival with "a good party."

The conspiracy in which Pulido played a part came to an abrupt ending on July 12, 1993, when Zapata, Santamaria, and Rolando Lopez were found murdered in the Drake Avenue apartment. Although Mario Lopez was ruled out as a suspect in the murders, the Chicago police first questioned him about the killings, placed him in two police line-ups, and included his picture in a group of photos shown to witnesses who had been near the scene of the murders. Lopez was *not identified* as one of the three men seen leaving the scene of the triple homicide. In fact, one of the witnesses identified Mario Lopez as having been around the Drake Avenue apartment on prior occasions, but stated very clearly that Lopez was not one of the individuals he saw leaving the scene at or about the time of the murders.

In connection with his questioning by the police, Lopez agreed to undergo a polygraph examination. The report of the polygraph examiner includes the notation "deception indicated." In the eyes of the polygraph examiner, Lopez was evidently less than truthful in some of his responses, but the report fails to indicate whether the judgement made by the examiner was in areas relevant to the investigation.[4]

### B. *Attempted Drug Trafficking: November 17, 1993*

Lopez began cooperating with the government shortly after his associates were killed. At Pulido's trial, he testified on direct examination that he cooperated because he "was afraid for [his own] safety and wanted the government to ... get the people who mur-

dered my friends," and admitted that he was also "seeking leniency" for himself. Lopez testified that the FBI and DEA paid all his expenses, including the rent for a luxury apartment in Chicago.[5] As part of his cooperation with the government, Mario Lopez approached Zapata's former distributors, including Pulido. In a series of conversations during late September 1993, Lopez told Pulido that he could now supply him with cocaine, utilizing the same Texas source once used by his deceased colleagues, Zapata and Santamaria. Pulido expressed interest and met with Lopez at the Siboney Lounge on November 10 to discuss a deal: 10 kilograms of cocaine at $19,000 per kilogram, delivery on November 17, with payment due about two weeks after delivery.

When November 17 arrived, Lopez called Pulido at approximately 9:20 AM and arranged to deliver the cocaine in front of a drug store forty minutes later. Pulido was arrested by DEA agents when, as planned, he arrived in front of the drug store and picked up a black bag containing what appeared to be cocaine. In reality, the bag contained "sham kilograms" (i.e., kilogram-sized, brick-shaped packages wrapped in duct tape to resemble the way cocaine is usually packaged).

### C. *The Trial of Ruben Pulido*

On April 19, 1994, Pulido filed a pre-trial motion to sever Counts I and II of the indictment, arguing that the alleged conspiracy took place well in advance of the events underlying the attempted drug trafficking charge and that the key players in the alleged conspiracy, with the exception of Lopez, were dead at the time of the November 1993 transaction. Pulido argued that Counts I and II charged him with distinct crimes that should be tried separately to avoid prejudicial "spillover" and confusion on the part

4. As discussed *infra,* the defense sought to cross-examine Mario Lopez (the government's key witness) regarding his performance on this polygraph exam.

5. At Pulido's trial, the government called Todd Edwards, a former DEA agent who had worked with Lopez, to testify as to the reasons for accommodating Lopez in such style. Edwards tes-

tified that the apartment building they selected for Lopez offered the following advantages: it was close to the DEA office, self-contained (i.e., had its own grocery store, video store, etc.), and offered a good security system. "Because of the murders," Edwards testified, "we deemed it necessary to have him protected."

of the jury. The district court denied this motion. However, during Pulido's trial, the court instructed the jury to consider each count and the evidence relating to it separately.

Before trial, the government filed consolidated motions in limine. First, the government sought to allow the introduction of evidence concerning the murders of Zapata, Santamaria, and Rolando Lopez. The prosecution argued that the omission of this evidence would leave the jury wondering how Lopez was able to cut a deal with Pulido "on his own" when Pulido had previously dealt only with Santamaria and Zapata. The government also argued that without evidence of the murders, the jury would wonder why Lopez ultimately decided to cooperate with the government and go undercover. Finally, the government claimed that the jury should know about the murders because they were "tangible evidence of the conspiracy and of the money dispute between Zapata and his suppliers." The defense, for its part, wanted to exclude evidence of the murders altogether, fearing that the jury might infer that Pulido was somehow involved in the killings. The court granted the government's motion seeking admission of the triple murder evidence.

The government's second motion sought to preclude any inquiry, on cross-examination, into Lopez' possible involvement with the murders, including any reference to his performance on the polygraph examination. The defense wanted to impeach Lopez by asking him about his possible involvement in the killings and by suggesting that it was Lopez' uncomfortable status as a murder suspect that led him to cooperate with the government. The government argued that the defense did not have a good faith basis for inquiring into these matters, especially as Lopez was never charged with the murders. The court also granted this motion, indicating that it would disallow inquiry into Lopez' involvement in the killings and his performance on the polygraph exam.

During Pulido's trial, the court allowed the government a very limited scope of questioning of Lopez concerning the murders and the subsequent investigation, as well as Lopez' motives for testifying. The defense argued unsuccessfully that the government had "opened the door" to cross-examination regarding the murders and Lopez' polygraph test (which immediately preceded Lopez' decision to cooperate with the government). Nevertheless, the court forbade, on cross-examination, any inquiry into Lopez' possible involvement in the murders or his performance on the polygraph exam. The court thus limited cross-examination to the same areas of inquiry permitted on direct examination of Lopez.

Although several areas were "off bounds" to the defense, it nevertheless cross-examined Lopez aggressively, attempting to undermine his credibility. Cross-examination of Lopez included an attack on Lopez' stated reason for cooperating with the government (fear for his own safety). Lopez admitted that he had a criminal record and that he had used cocaine between December 1992 and March of 1993. The jury also learned that Lopez was himself facing drug conspiracy charges and that he had been promised a reduced sentence in return for his cooperation with the government. Finally, the defense was able to elicit from Lopez that the FBI and DEA had supported him "pretty nicely" after he decided to cooperate with them, paying for all of his expenses, including $1,400 a month rent for a luxury apartment in Chicago.[6]

Mary Bustamante, an FBI special agent who accompanied Pulido to DEA headquarters following his arrest on November 17, 1993, also testified at Pulido's trial. Bustamante testified that before interviewing Pulido on November 17, she and another FBI agent had each advised Pulido of his *Miranda* rights. Additionally, Pulido signed a written waiver of his rights after reading aloud from an advice of rights form. During the interview, Pulido told Bustamante that he was meeting Lopez at the drugstore because he had agreed to transport some cocaine for Lopez. According to Bustamante, "[Pulido] said that he knew that he was transporting cocaine and that he was going to get paid

**6.** See note 5 *supra.*

about $200 for it." Pulido also told Bustamante that he had only met Lopez "a couple months ago" and knew him by only his first name, that he had never spoken to Lopez on the phone prior to November 17, 1993, and that he did not know any of Lopez' associates.

In addition to the testimony of Lopez and Special Agent Bustamante, the jury heard the testimony of an FBI agent who had participated in surveillance of Pulido and Lopez, a DEA agent who worked with Lopez after Lopez agreed to cooperate with the government, and a translator for the FBI who worked on the Spanish-language tapes relevant to the case. The jury also considered transcripts and audio recordings from the wiretap of the Drake Avenue apartment, and transcripts of conversations between Lopez and Pulido that had been recorded during the period leading up to the sting operation on November 17, 1993.

After deliberation, the jury returned a verdict of guilty on both counts. The defense filed a motion for a new trial or acquittal. The district court denied any post-trial relief.[7] This appeal followed.

## II. ISSUES

This appeal raises four issues: (1) whether the district court abused its discretion by admitting evidence concerning the triple murders or by limiting cross-examination of Lopez, (2) whether the government's evidence was sufficient to establish Pulido's guilt beyond a reasonable doubt, (3) whether the court's refusal to sever the two counts of the indictment was an abuse of discretion, and (4) whether the drug conspiracy statute under which Pulido was convicted requires proof of an overt act or, in the alternative, whether its lack of such a requirement renders it unconstitutional.

## III. DISCUSSION

### A. Evidentiary Rulings

Initially, Pulido challenges several of the district court's evidentiary rulings. First, he argues that the district court erred by permitting the jury to hear testimony concerning the triple murder at the Drake Avenue apartment. This evidence, according to Pulido, was prejudicial, inasmuch as it created "an unjustified inference of [Pulido's] involvement and his dangerousness." Pulido also argues that the court erred by limiting cross-examination of Mario Lopez to preclude inquiry into Lopez' possible involvement in the killings or his performance on the polygraph examination. These restrictions on the cross-examination of the government's key witness, Pulido claims, supposedly denied him his rights under the Confrontation Clause of the 6th Amendment.

### 1. Admissibility of Evidence Concerning the Triple Murder

The government, in its consolidated motions in limine, first raised the issue of whether evidence concerning the triple murders at the Drake Avenue apartment should be considered by the jury at Pulido's trial. The government sought to have this evidence admitted, arguing that it was relevant and not unfairly prejudicial. The evidence was relevant (a) to "explain both the opportunity and motive for Lopez to cooperate with the government," and (b) to shed light on how Lopez was able to deal directly with Pulido and other customers of the Zapata conspiracy in the Fall of 1993. Without such evidence, the government argued, there would be significant factual gaps in the prosecution's case. Jurors would wonder how and why Lopez ended up cooperating with the government after being an active, loyal member of the conspiracy himself. The murders and Lopez' fear for his own safety explain the transformation. Absent the triple-murder evidence, jurors would also wonder how Lopez was able to approach Pulido and other customers of the Zapata organization in the Fall of 1993, when these customers had previously dealt directly with Zapata and Santamaria. Finally, the government also pointed out that the murders were "tangible evidence of the conspiracy and the money dispute between Zapata and his suppliers." In the

---

**7.** The issues raised in Pulido's post-trial motions are nearly identical to those raised on appeal. A detailed discussion of these motions is therefore omitted.

government's view, a stipulation that Zapata, Santamaria, and Rolando Lopez merely "disappeared" would be inadequate to explain "Lopez's motivation and new role as a cooperator" and would "raise unwarranted questions in the minds of the jurors as to the absence of the co-conspirators in Lopez's Fall of 1993 dealings with [the] defendant." Moreover, a stipulation that the co-conspirators had merely disappeared (and not been murdered) would fail to explain how investigators were able to recover certain pieces of evidence at the Drake Avenue apartment.

The government also argued that admission of the triple-murder evidence would not be unfairly prejudicial:

> The probative value of admitting this evidence will not be substantially outweighed by the danger of unfair prejudice. The government will present this evidence cautiously, eliciting simply that the three men were found murdered in their apartment after a protracted dispute with their drug suppliers over money.... No unnecessary details will be presented.... [t]he government will not argue to the jury ... that drug dealing leads to murders.... The government will readily agree and stipulate that defendant Pulido had no involvement with the murders.

The district court granted the government's motion to admit the triple-murder evidence. During the government's opening statement at trial (when counsel for the United States first mentioned the murders), the judge interrupted with the following comments for the jury:

> The evidence of the fact of the murders of three people that have been described is relevant to a number of matters in this case, but you should understand—I think you do—from the beginning this case is not about murder. Mr. Pulido is not only not charged in this case with that [murder], but there is no evidence whatever, either at the state level or at this level, that he had anything to do with those murders; and any discussion about murders at this trial should not be taken as any sort of inference or any evidence at all that Mr. Pulido, the defendant in this drug

case, had anything whatever to do with those murders.

> So, it is only necessary for you to consider and understand the evidence in a variety of other ways, but it is not to be taken as any inference at all or any direct evidence at all that Mr. Pulido had anything whatever to do with those murders.

Tr. Vol. I at 12 (emphasis added). The district court ruled that the evidence was relevant, while simultaneously addressing Pulido's concern (repeated in his appellate brief) that admission of the triple murder evidence prejudiced him by raising concerns that he was involved in the killings.

■ Evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 and 402. If the probative value of evidence is "substantially outweighed by the danger of unfair prejudice," then the evidence may be excluded. Fed.R.Evid. 403. However, our decisions have emphasized that most relevant evidence is, by its very nature, prejudicial, and that evidence must be *unfairly* prejudicial to be excluded. *United States v. McNeese,* 901 F.2d 585, 599 (7th Cir.1990). "Evidence is unfairly prejudicial only if it 'will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'" *United States v. Vretta,* 790 F.2d 651, 655 (7th Cir.1986), *cert. denied* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986) (quotation omitted).

■ The trial court has "broad discretion to determine the admissibility of evidence" and will be reversed "only upon a clear showing of abuse of discretion." *United States v. Hattaway,* 740 F.2d 1419, 1424 (7th Cir. 1984), *cert. denied* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). "Appellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier,* 923 F.2d 496, 503 (7th Cir.1991), *cert. denied* 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (*citing* Matthew 19:24).

In *United States v. McNeese*, this court held that it was not an abuse of discretion for the district court to allow evidence of an attempted murder as part of the relevant and admissible evidence in a drug conspiracy trial. 901 F.2d at 599. We noted that exclusion of the attempted murder evidence in that case "would have left a 'chronological and conceptual void' in the account of events surrounding the role of [one of the co-conspirators] in the drug conspiracy." *Id.* (quotation omitted); *see also Vretta*, 790 F.2d at 656 (exclusion of evidence would leave jury with "a 'sanitized' version of the crime with too many gaps and questions left dangling ... thus forcing the jury to speculate."). Similarly, the exclusion of evidence concerning the triple murder at the Drake Avenue apartment would have created a "chronological and conceptual void" in the government's case against Pulido, leaving jurors with significant questions about Lopez' relationship with Pulido and Lopez' decision to cooperate with the government.

Because the triple murder evidence was relevant and, in view of our comments, not unfairly prejudicial, we hold that the district court did not abuse its discretion by admitting a limited amount of evidence concerning the murders. Moreover, as discussed in more detail below, we note that the court was careful to limit testimony in this area so as to avoid confusion, unfair prejudice, or misleading the jury. The testimony clearly established that Zapata, Santamaria, and Rolando Lopez were murdered at the Drake Avenue apartment, that the authorities had questioned Mario Lopez as part of their investigation, and that Lopez was not charged in connection with the murders. Lopez was also allowed to testify that in the period following the murders, he cooperated with the government largely out of fear for his own safety. At no point did the prosecution infer or suggest that Pulido was involved in or responsible for the killings, nor did it dwell on the theme that drug-dealing is an inherently violent activity. In short, the testimony concerning the murders "was brief and non-inflammatory in nature, reducing any risk that the jury's emotion would be stirred by such evidence and that they would, as a result, be compelled toward irrationality and the defendant thus prejudiced." *United States v. Macias*, 930 F.2d 567, 572 (7th Cir.1991).

## 2. *Limitations on Cross–Examination of Lopez*

The issue of whether to restrict cross-examination of Lopez was first raised by the government in its consolidated motions in limine. The government asked the court to prohibit the defense from "stating or introducing any argument, questions, or evidence, creating the inference that Mario Lopez is responsible for the murders." The government feared that the defense would "attempt to portray Lopez as being the murderer" and suggest that Lopez was testifying favorably for the government in return for "a promise of non-prosecution [on murder charges]." In support of its motion, the government noted that Lopez was cleared as a murder suspect after three days of questioning by the authorities (Chicago police, FBI, and DEA) and after eyewitnesses confirmed that he was not one of the men seen fleeing the murder scene. The government also pointed to the strong likelihood that Zapata and his friends were murdered by Zapata's drug suppliers, who had been in Chicago shortly before the murders took place in an attempt to clear up a dispute over $300,000.

The district court granted the government's motion and apparently agreed with the government's rationale. During trial, out of the presence of the jury, the judge admonished Pulido's lawyers not to suggest that Lopez was "part of the killing," saying that "there is no evidence at all that this man [Lopez] had anything to do with that murder." Additionally, the judge stated that he was reluctant to "try the murder case here," i.e., to confuse or mislead the jury with a detailed inquiry into the murders. We think that the approach taken by the trial court judge makes sense in light of his decision (discussed above) to restrict and limit the evidence received concerning the triple murders. The judge clearly wanted to avoid a distracting and sidetracking inquiry into the triple murders; his decision to avoid such an inquiry required that he restrict and limit the cross-examination of Lopez, just as it re-

quired him to instruct the jury that Pulido was not in any way responsible for those murders.

Nevertheless, Pulido claims: (a) that the government was permitted to question Lopez about his motives for cooperating with the government, (b) that the court thus "opened the door" to cross-examination of Lopez concerning his possible involvement in the killings and his performance on the polygraph examination, and (c) that the court's rulings robbed Pulido of the opportunity to cross-examine Lopez effectively, in violation of his 6th Amendment rights.

It is true that the court permitted the government to question Lopez concerning his motives for cooperating with the government. This occurred during an exchange on direct examination of Lopez (to which Pulido's counsel failed to make a contemporaneous, specific objection at the proper time). When asked the reason for his cooperation with the government, Lopez replied that he "was afraid for [his own] safety and wanted the government to look and help me get the people who murdered my friends." In his appellate brief, Pulido argues that this exchange created a "clear and unequivocal inference ... that Pulido was involved in the murders." We do not find such an inference either clear or unequivocal, and in any case the judge's instruction at the outset of the trial made it clear to the jurors that such an inference was impermissible.

More importantly, we do not agree that this exchange (or any of the questions asked by the government) "opened the door" to broad cross-examination of Lopez, for the area of inquiry, according to our review of the record, was specific and confined to Lopez' reasons for cooperating with the government. Part of the rationale behind admitting limited evidence of the murders in the first place was to provide context for Lopez' decision to cooperate with the government. Thus, it was appropriate for the court to give the government a limited amount of leeway in questioning Lopez concerning his motives for cooperating, and to allow into evidence just enough information about the murders to keep the jury from speculating. At best, this amounted to opening the door a crack:

wide enough to allow cross-examination concerning Lopez' motives for cooperating, but not wide enough to permit a full-blown inquiry into the tenuous assertion that Lopez was somehow involved in the murders and then was less than truthful about his involvement during the polygraph examination.

Even if one concedes that the court partially "opened the door" by giving the government some latitude to question Lopez about his motives for testifying, it is not true that Pulido was prevented from an effective cross-examination of Lopez. In fact, the cross-examination of Lopez was vigorous, and included an attack on Lopez' motives for cooperating with the government. Pulido's lawyers properly were not permitted to argue explicitly that Lopez cooperated with the government because he feared an indictment on charges related to the murders. The closest the defense came to this line of questioning was when it asked Lopez whether the police initially considered him a suspect in the triple murder. At this juncture, the prosecution objected and the defense requested a sidebar, during which the court admonished the defense not to suggest that Lopez was involved in the murders. Nevertheless, counsel for Pulido did call into question Lopez' statement that he cooperated largely out of fear for his own safety. Defense counsel established that Lopez was largely unsupervised during the period of his cooperation and that he took no measures to change his name or appearance. "If you were so afraid about getting killed," counsel for Pulido asked Lopez on cross-examination, "why were you walking around the street ... without any protection?" Defense counsel also asked repeatedly if Lopez had been the only occupant of the Drake Avenue apartment not to be murdered, hinting that perhaps there was a good reason for this. By way of impeachment, the defense also established that Lopez used cocaine between December 1992 and March of 1993, that he had a criminal record, that he had been promised a reduced sentence for drug conspiracy charges in return for his cooperation with the government, and that the FBI and DEA supported him "pretty nicely" after he decided to cooperate with them.

Looking back on the trial, this court cannot say that the trial court abused its discretion by limiting cross-examination of Lopez. Federal Rule of Evidence 403 permits a district court judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." F.R.Evid. 403. The district court was thus required, under Rule 403, to balance the questionable relevance of the excluded testimony against the hazards of admitting that evidence (i.e., needlessly confusing or misleading the jury and wasting the court's time). We have held that "because it is a 'comparison of intangibles,' a district court's Rule 403 balancing is afforded a special degree of deference: '[o]nly in an extreme case are appellate judges competent to second-guess the judgement of the person on the spot, the trial judge.'" *Glecier*, 923 F.2d at 503 (quotation omitted). We have also held that:

> the district court's discretion in controlling the extent of cross-examination is broad. For cross-examination has no natural limits, and the trial judge must therefore exercise judgement in deciding when the point of diminishing returns has been reached, or passed—a judgement that will depend on the particulars of each case, and on such unreviewable imponderables as the judge's assessment of the jury's comprehension and attention span.

*United States v. Herrera–Medina,* 853 F.2d 564, 566 (7th Cir.1988) (citations omitted).

From our review, we agree with the district court's rulings. We are also mindful of the precedent requiring us to be circumspect and to interfere only rarely with a trial court's weighing or balancing of the Rule 403 factors. Accordingly, we hold that the court's decision to limit cross-examination of Lopez concerning his possible involvement in the Drake Avenue triple murder was not an abuse of discretion.

■ On appeal, Pulido also argues that he was denied his rights under the Confrontation Clause of the Sixth Amendment when the court limited inquiry into Lopez' possible involvement in the murders. We do not believe that Pulido's invocation of the Sixth Amendment dramatically changes the Rule 403 analysis set forth above. The right of an accused individual to test the accuracy of adverse testimony is indeed an important safeguard in our system of justice. *See, e.g., Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). However, "the Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross examination." *United States v. Aguilar,* 948 F.2d 392, 397 (7th Cir.1991), *cert. denied* — U.S. ——, 114 S.Ct. 1841, 128 L.Ed.2d 467 (1994) (citation omitted). The Confrontation Clause does not permit cross-examination "in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). The Supreme Court in clear and unambiguous language has stated that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

In order to determine whether a limitation on cross-examination violates the Sixth Amendment, we will "look to the record as a whole ... and to the alternative means open to impeach the witness." *United States v. Diaz,* 876 F.2d 1344, 1349–50 (7th Cir.1989) (quotation omitted). We have looked to the record as a whole and we observe that the defense very cleverly, vigorously, and exhaustively cross-examined Lopez, bringing to light a number of factors reflecting poorly on his credibility. Because there were clearly adequate means of impeaching Lopez other than suggesting his involvement in the triple murders, we conclude that Pulido's Sixth Amendment rights were not violated.

### 3. *Exclusion of Polygraph Results*

Finally, Pulido argues that "the jury would have received a completely different picture of Lopez had they known he failed a govern-

ment administered polygraph regarding his involvement in the murders." As an initial matter, it is not clear to this court that Lopez actually "failed" the polygraph exam administered by the Chicago police. The polygrapher's report contains the notation "deception indicated," but the handwritten notes accompanying the report are largely unintelligible and nowhere does the report specify which questions the examiner believed Lopez answered deceptively. The report does not remark on the degree or extent of deception "indicated," nor the area of inquiry in which the witness was allegedly less than forthcoming and in the technician's opinion deceptive. Thus, even assuming that polygraphs are 100% accurate and reliable, this report falls short of providing an adequate basis for inferring that Lopez lied to the police, much less that he was involved in the Drake Avenue murders.

■ More fundamentally, we refuse to interfere with a trial judge's decision to admit or exclude polygraph results. Our decisions acknowledge the considerable scientific and legal debate over polygraph testing and recognize that a trial court deciding whether to admit polygraph evidence "must engage in a delicate balancing of many factors including probative value, prejudicial effect, confusion of the issues, misleading the jury, and undue delay." *United States v. Olson*, 978 F.2d 1472, 1480 (7th Cir.1992), *cert. denied* — U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); *see also United States v. Kampiles*, 609 F.2d 1233, 1244 (7th Cir.1979), *cert. denied* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980) ("This court has persistently refused to adopt [a per se rule against admissibility of polygraphs], choosing rather to leave the decision on admissibility to the sound discretion of the district court."). Accordingly, we will only reverse the district court if it has abused its discretion. *Olson*, 978 F.2d at 1480.

■ In our view, the district court in this case did not abuse its discretion when it decided to exclude testimony concerning Lopez' polygraph exam. In *United States v. Olson*, as in this case, a criminal defendant appealed on the basis that the district court had allegedly improperly excluded the re-

sults of a polygraph test administered to a key government witness. We upheld the district court, noting that (a) the results of the polygraph were peripheral to the "core issues" of the case, and (b) the defendant was able to impeach the government's witness successfully without the use of the polygraph examination. *Id.* These same factors persuade us to uphold the district court's exclusion of the Lopez polygraph. First, we note that the exam results have little or nothing to do with Pulido's guilt or innocence. This, after all, was not a murder trial but the drug conspiracy trial of Ruben Pulido. Second, we observe that Pulido, like the defendant in *Olson*, was able to conduct a thorough and aggressive cross-examination of Lopez (discussed above) without mentioning the polygraph results.

In light of the district court's broad discretion to admit or exclude polygraph results, we decline to hold that the court abused its discretion with respect to the polygraph evidence in this case.

### B. *Sufficiency of the Evidence*

■ Pulido claims that the evidence adduced at trial was insufficient to establish his guilt beyond a reasonable doubt. We note, as we have in the past, that an appellant making such an argument "faces a nearly insurmountable hurdle." *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992). In reviewing the sufficiency of the evidence underlying a criminal conviction, our role is a limited one:

> We review the evidence in the light most favorable to the Government, and if we determine that a rational jury could have found the defendant guilty, we will affirm the conviction. In conducting this review, "[w]e will not reweigh the evidence or judge the credibility of witnesses. That is the role of the jury, not an appellate court."

*United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993) (citations omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt

beyond a reasonable doubt." *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992) (citation omitted).

According to Pulido, the government's case "especially as it related to the ... alleged conspiracy, consisted solely of the testimony of a government paid informant/co-conspirator/cocaine addict/convicted felon" (Lopez). Pulido's brief also mentions that Lopez was testifying in exchange for a reduced sentence. The string of pejoratives used to describe Lopez invites this court to weigh his credibility as a witness. We decline this invitation. Insufficiency arguments based on a witness's purported lack of credibility are "wasted on an appellate court" because "the jury ... is the only entity entitled to make such credibility determinations." *United States v. Molinaro,* 877 F.2d 1341, 1347 (7th Cir.1989). In fact, we have held that a conviction for conspiracy may be supported by testimony that is "totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant." *Id.* We will not second-guess a jury on credibility issues because it has had

> the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].

*United States v. Lakich,* 23 F.3d 1203, 1210–11 (7th Cir.1994) (quotation omitted).

■ Furthermore, we note that the evidence did not consist solely of Lopez' testimony, as Pulido maintains. First, we note that even without Lopez' testimony, the government presented evidence sufficient to establish an attempt to possess with intent to distribute cocaine (Count II of the indictment). This charge requires proof that Pulido acted with specific intent to commit the underlying offense, and in addition took a substantial step towards its completion. *United States v. Cea,* 914 F.2d 881, 887 (7th Cir.1990). The offense of attempting to possess with intent to distribute is complete when a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of a drug. *Id.* at 888. In addition to the testimony of Lopez (who participated in the sting operation), the government introduced: (1) Pulido's statement to the authorities following his arrest (Pulido, fully aware of his *Miranda* rights, admitted knowing there was cocaine in the bag and told the authorities that he was going to transport the cocaine for Lopez in exchange for $200), (2) transcripts of recorded conversations between Lopez and Pulido leading up to the November 17, 1993 sting operation, (3) a transcript of the conversation that occurred in front of the drugstore on November 17, 1993 (Lopez informed Pulido that there were ten kilograms in the black bag), and (4) the testimony of the FBI agent who described the sting operation and the "sham kilograms" used therein. A rational jury could conclude, from this evidence, that Pulido had been active in negotiating a drug transaction and that he had taken physical steps to obtain possession of a controlled substance.

■ Similarly, the government presented evidence sufficient to sustain Pulido's conviction for conspiracy to distribute cocaine. The elements of conspiracy are clearly established:

> A conspiracy is a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act. To prove that a defendant was a member of the conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant. To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose. When reviewing conspiracy convictions, we must be certain that the Government presented substantial evidence that the defendant was a conspirator. The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.

*Campbell,* 985 F.2d at 344–45 (citations omitted). The existence of the cocaine ring as well as Pulido's "participatory link" with the

conspiracy are demonstrated, not just by Lopez' testimony, but also through the recorded telephone calls made by Pulido to the Drake Avenue apartment. As the government notes in its brief, these conversations reveal "a level of knowledge, eagerness, and coded secrecy that demonstrate [Pulido's] full membership in the drug conspiracy." Additionally, Pulido's name and phone number appear in papers discovered by the police in Zapata's apartment following the murders, along with the names and numbers of other individuals or entities identified by Lopez as being involved in the conspiracy, including "Cuco" (the middleman between Zapata and his source in Texas) and customers such as Ismael Cano, Meliton Perez ("Mely"), Rogelio Hernandez ("El Gato"), and Juan Alcantar ("Canelo").[8] Also discovered in Zapata's apartment were several business cards for the Siboney Lounge, where members of the conspiracy often met to transact business.

In our opinion, the record contains ample evidence from which a jury could conclude (1) that Pulido attempted to possess with intent to distribute cocaine on November 17, 1993, and (2) that he participated in an ongoing cocaine distribution network from December 1992 through July 1993. We reject Pulido's claim that the evidence presented at his trial was insufficient to convict him of either of these crimes.

## C. *Severance*

Pulido appeals the denial of his severance motion by the district court, arguing that he was "clearly prejudiced" by the joinder of the two counts against him. The government, Pulido claims, should not have been allowed to "boot-strap their two counts into a single trial and benefit from . . . spillover evidence." First, Pulido asserts that a conviction on the conspiracy charge (Count I) "would not have been possible" without the benefit of evidence introduced in support of the attempt charge (Count II). Pulido's argument here is closely linked to his sufficiency of the evidence challenge, discussed *supra.* According to Pulido, the government's evidence in support of a conspiracy charge was "so

incredible and insufficient that the jury clearly relied on and improperly considered evidence relevant only to the Count II [charge] in reaching its verdict upon Count I." Pulido also argues that evidence introduced in support of the conspiracy charge tainted or "spilled over" into the jury's deliberations on the attempt charge. Specifically, Pulido claims that the evidence concerning the triple murder at the Drake Avenue apartment "inflame[d] the jury by interjecting evidence that drug dealers are ruthless and dangerous individuals deserving of punishment."

 The district court denied Pulido's motion for a severance pursuant to Federal Rule of Criminal Procedure 14, which permits a district court judge to order separate trials "if it appears that a defendant or the government is prejudiced by a joinder of offenses . . . for trial" and justice requires a severance. Fed.R.Crim.P. 14. Our decisions have consistently held that a defendant challenging a district court's denial of a severance motion must establish that he suffered "actual prejudice" resulting from the denial of the motion. *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir.1988), *cert. denied sub nom. Estevez v. United States,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Curry,* 977 F.2d 1042, 1050 (7th Cir.1992), *cert. denied sub nom. Holland v. United States,* — U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993) ("severe prejudice" required). In other words, he must demonstrate "that without a severance he was unable to obtain a fair trial, not merely that a separate trial would have offered him a better chance for acquittal." *United States v. Stillo,* 57 F.3d 553, 557 (7th Cir.1995) (citation omitted). We will overturn a district court's ruling on a Rule 14 severance motion "only upon a showing of a *clear* abuse of discretion." *United States v. Leiva,* 959 F.2d 637, 641 (7th Cir.1992), *cert. denied* — U.S. ——, 113 S.Ct. 2372, 124 L.Ed.2d 277 (1993) (citations omitted, emphasis added). The district court did not abuse its discretion in refusing to grant Pulido's severance motion because Pulido did not suffer actual prejudice. In other words, the

---

**8.** The government's Presentence Investigation Report indicates that Alcantar, Hernandez, and

Perez were successfully prosecuted for crimes connected with the cocaine ring led by Zapata.

denial of Pulido's motion did not make a fair adjudication of the charges against him impossible. It should be clear from our discussion of the sufficiency of the evidence, *supra*, that there was ample evidence to convict Pulido without resort to any alleged "spillover" evidence. Although separate trials may have improved Pulido's chances for acquittal, it is quite likely that separate trials would also have yielded two convictions, resulting in wasted time, effort, and judicial resources. The trial court is permitted wide discretion in ruling on Rule 14 motions precisely because it is in the best position to "balanc[e] ... the cost of conducting separate trials and the possible prejudice inherent in a single trial." *Moya–Gomez*, 860 F.2d at 754.

The nature of Pulido's trial and the manner in which it was conducted further persuade us that Pulido was not prejudiced by the court's ruling. A single trial is appropriate if "it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the [relevant] evidence." *Id.* at 768 (quotation omitted); *see also United States v. Rajewski*, 526 F.2d 149, 155 (7th Cir.1975), *cert. denied* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976) ("If the jury can reasonably be expected to keep the evidence separate as to each count ... severance should be denied."). Because Pulido's trial was not particularly lengthy or complex, the risk of juror confusion was minimal. As for the danger of prejudicial "spillover," we note that the district court carefully instructed the jury to give separate consideration to each charge against Pulido.[9] Such instructions are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Berardi*, 675 F.2d 894, 901 (7th Cir.1982).

The Supreme Court has held that "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary [e.g., jury instructions] to the sound discretion of the district courts." *Zafiro v. United States*, 506 U.S. 534, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). We do not believe that the court abused this discretion in assessing the risk of prejudicial "spillover" or juror confusion in Pulido's trial. Moreover, the court took steps to obviate these risks by issuing carefully-worded instructions to the jury. We therefore affirm the district court's denial of Pulido's motion for a severance.

### D. *Interpretation and Constitutionality of 21 U.S.C. § 846*

Finally, we address Pulido's arguments concerning the drug conspiracy statute, enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and amended by the Anti–Drug Abuse Act of 1988. In its current form, the statute provides that:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846.

Pulido correctly notes that the drug conspiracy statute, "as written and enforced," lacks an "overt act" requirement. In other words, the statute does not require that any steps be taken in furtherance of an unlawful agreement in order for the crime of conspiracy to be complete. Pulido appears to make two arguments with respect to the statute and his conviction under it. First, Pulido urges this court to hold that the statute does contain an overt act requirement and to remand Pulido's case for further proceedings consistent with such a holding. Alternatively, Pulido argues that we should vacate the

---

**9.** The court instructed the jury that:

Each count of the indictment charges the defendant with having committed a separate offense.

Each count and the evidence relating to it should be considered separately, and a separate verdict should be returned as to each count.

Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count. You may find, however, that evidence relevant to one count may be relevant for another count of the indictment.

jury verdict and enter a judgement of acquittal because a conspiracy statute with no overt act requirement subjects "mere thoughts and conversations to criminal prosecution and imprisonment" and therefore violates the First Amendment.

Pulido's brief discusses the law of conspiracy at length, citing authorities as ancient as Bracton (13th century) and as modern as *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). Conspicuously missing, however, is any discussion of Justice O'Connor's recent unanimous opinion in *United States v. Shabani,* —— U.S. ——, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). In *Shabani,* the Court held that proof of an overt act is not required to establish a violation of the drug conspiracy statute. Resolving a circuit split on this issue, Justice O'Connor took special note of this court's decision in *United States v. Sassi,* which reaffirmed our position that § 846 does not require proof of an overt act. 966 F.2d 283 (7th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). In *Sassi,* we determined that § 846 had no "hidden overt-act requirement" by contrasting the language of § 846 with the words of the general conspiracy statute, 18 U.S.C. § 371, which explicitly requires a conspiracy plus some act in furtherance of that conspiracy. *Id.* at 284. Justice O'Connor adopted precisely this rationale in *Shabani,* holding that "Congress' silence in § 846 speaks volumes" and that "Congress appears to have made the choice [to omit overt-act language] quite deliberately." —— U.S. at ——, 115 S.Ct. at 385. The Court held that "the plain language of the statute and settled interpretive principles reveal that proof of an overt act is not required to establish a violation of 21 U.S.C. § 846." *Id.* at ——, 115 S.Ct. at 386.

Having determined the meaning of the statutory language in § 846, we now turn to the issue of whether the statute, properly interpreted, violates the Constitution. Pulido argues that a conspiracy statute with no overt-act requirement punishes mere thought and thus violates the First Amendment. The Supreme Court answered this argument in *Shabani* by stating that "[t]he prohibition against criminal conspiracy ... does not punish mere thought" because "the criminal agreement itself is the *actus reus.*" *Id.* (citations omitted). An agreement among two or more individuals to commit a criminal act, like a contract, involves a "meeting of the minds." Such an agreement is considered dangerous, and has long been treated as a distinct crime, because cooperation makes success more likely. *Sassi,* 966 F.2d at 284. Congress, by making the act of conspiracy to distribute controlled substances unlawful, has neither criminalized private thoughts nor invaded the sphere protected by the First Amendment.

In light of *Shabani,* we decline Pulido's invitation to "hold that Congress implicitly included an overt act requirement when it passed § 846." We also reject Pulido's claim that his conviction should be reversed because § 846 is unconstitutional.

### IV. CONCLUSION

We AFFIRM.