In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2571

United States of America,

Plaintiff-Appellee,

v.

Reginald Miles,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 107--Joan B. Gottschall, Judge.

Argued January 19, 2000--Decided March 29, 2000

Before Bauer, Cudahy, and Evans, Circuit Judges.

Bauer, Circuit Judge.  A jury convicted Reginald Miles of attempted armed bank robbery and using a firearm during the commission of a violent crime. The district court sentenced Miles to mandatory life imprisonment for the attempted bank robbery and a consecutive sentence of sixty months in prison for carrying a gun during the attempted robbery. On appeal, Miles challenges two evidentiary rulings. We affirm.

I.  Background

On February 9, 1998, Reginald Miles walked into the Midland Federal Savings Bank in Chicago, Illinois and approached one of the tellers. Miles initially told the teller that he wanted to open a new account, but then drew a gun and exclaimed "this is a robbery, nobody move!" Miles pointed his gun at bank security guard Keith Contant, who was standing 25 to 35 feet away from him. Contant responded by drawing his own gun and firing several shots at Miles. Bank employees immediately sought shelter from the gunfire underneath counters and desks; one employee activated an alarm. During this shoot-out, Miles backed towards the bank's exit and then fell to the floor. When Contant saw Miles drop, he concluded that one of his shots must have struck Miles and stopped firing his gun. While Contant went to see whether the bank employees were

injured, Miles got up and left the bank.

Outside of the bank, several bystanders on the sidewalk watched Miles exit the bank and limp north on California Avenue. These witnesses noticed that Miles was wearing a black coat, a black knit cap, and carrying a gun. They also saw that Miles had blood on his leg as he stumbled towards an alley north of the bank. When he reached the alley, Miles met a two-tone blue station wagon driven by an African-American male. Witnesses noticed that the station wagon had a large dent in the rear and no license plates. Miles went to the passenger side of the car and got in the blue station wagon. The car then sped away from the scene.

A day or two after the attempted bank robbery, Miles called his probation officer and said that he could not keep an appointment for a drug test because he had been shot./1 Miles told his probation officer that he had been kidnapped in a case of mistaken identity and was shot during the kidnapping. The next day, Miles' probation officer saw a newspaper article about the attempted bank robbery and called the FBI because she suspected that Miles may have committed the crime. She told the FBI where Miles lived and provided the agents with his photograph.

FBI agents went to Miles' residence and spotted a vehicle that matched the descriptions of the getaway car provided by eyewitnesses. An investigation revealed that the car was registered to Miles. The FBI agents photographed Miles' automobile and showed the pictures to witnesses who identified the car as the one they had seen the day of the attempted robbery.

When agents arrived at Miles' residence to arrest him, they found Miles on crutches attempting to escape through the back door. A search of Miles' home turned up articles of clothing that matched the descriptions of the clothes worn by the bank robber. The agents also discovered papers from Gary Methodist Hospital in Gary, Indiana indicating that a person named Richard Eagan received medical treatment for gunshot wounds on February 9, 1998--the day of the attempted robbery. The agents searched Miles' station wagon and found blood on the seat covers and seat cushions. The search of the car also produced a black leather jacket with blood on it. DNA analysis of the blood found in the car and on the jacket confirmed that it was Miles' blood.

When FBI agents arrested him, Miles had gunshot wounds in his lower extremities and a bullet still lodged in his left leg just above his knee. After his arrest, Miles was arraigned and held in

prison pending trial. Several weeks after his arrest and incarceration, prison doctors removed the bullet from Miles' leg and preserved it as evidence.

At trial, government ballistics expert Steven Casper testified that the bullet recovered from Miles' leg was fired from bank security guard Contant's gun. Casper stated that the "general rifling characteristics" left on a spent bullet show the make and model of gun that fired the bullet. Because these "general rifling characteristics" can only identify the make and model of gun that fired the bullet, they will be the same for hundreds of firearms. However, Casper explained that in addition to acquiring "general rifling characteristics," every gun imprints its own unique pattern of scratch marks or "striations" on each bullet that is fired from that particular gun. By analyzing these unique fingerprint-like "striations" on the bullet taken from Miles' leg, and comparing them to striations on test bullets fired from Contant's gun, Casper determined that the bullet from Miles' leg had been fired from the bank security guard's gun.

Miles testified in his own defense and denied being the man who attempted to rob the bank. According to Miles, on the day of the robbery he and a friend had driven to Gary, Indiana to look for jobs. They stopped at a store so Miles' friend could buy cigarettes and Miles waited in the parking lot. Miles said that while he was in the parking lot, two strange men approached him and kidnapped him at gunpoint in "a case of mistaken identity." Miles tried to convince the kidnappers that he was not the man they were looking for, and even showed them his state identification to prove it. The kidnappers told Miles they planned to kill him anyway. Miles testified that during a scuffle in the back seat, he managed to kick the car door open and escape. The kidnappers, however, shot Miles from point blank range and then drove away.

Miles claimed that after the kidnappers left, he crawled down the street bleeding until a car stopped to pick him up. Miles testified that this car had plastic seat covers and that its driver took him to Gary Methodist Hospital in exchange for five dollars. When he arrived at the hospital, Miles used the false name Richard Eagan because he feared that his probation officer might learn that he had left Illinois without permission. Miles said that he received treatment for his gunshot wounds, but doctors were unable to remove the bullet from his left leg.

After doctors released him from the hospital, Miles said that he took a taxi from Gary, Indiana

to his home in Chicago. Miles testified that shortly after he arrived home, he decided to go back to the hospital and asked a friend to drive him. Miles entered the passenger side of his station wagon to return to the hospital, but the car did not start, so he abandoned the trip. According to Miles' testimony, this is how his blood got on the seats and cushions of his car. Finally, Miles called the government's ballistics expert a "liar" and denied that the bullet in his leg was fired from Contant's gun.

The jury did not believe Miles' story; they convicted him of attempted armed bank robbery in violation of 18 U.S.C. sec. 2113(a) and (d). The jury also found him guilty of using a firearm during the commission of a violent crime in violation of 18 U.S.C. sec. 924(c)(1). Because Miles had at least three prior convictions for violent crime, the district court sentenced him to mandatory life imprisonment for the attempted armed bank robbery under 18 U.S.C. sec. 3559(c). The district court also imposed a consecutive sixty-month sentence for using a firearm during the commission of a violent crime. Miles filed a timely notice of appeal and now challenges two of the district court's evidentiary rulings.

## II.  Analysis

Like all evidentiary challenges, we review the district court's rulings in this case for abuse of discretion. "The district court's decision must strike us as fundamentally wrong for an abuse of discretion to occur." Anderson v. United Parcel Serv., 915 F.2d 313, 315 (7th Cir. 1990).

The first evidentiary ruling about which Miles complains relates to the government's ballistics expert, Steven Casper. While Casper was comparing the bullet from Miles' leg to the test bullets fired from Contant's gun, he kept handwritten notes to record his findings. The government provided Miles' lawyer with a copy of these notes, but this copy was illegible because it had been faxed and photocopied. In addition to his handwritten notes, Casper also prepared a brief final report, documenting his conclusion that the bullet from Miles' leg had been fired by Contant's gun. Unlike Casper's notes which were handwritten and illegible, his final report was typed and Miles' lawyer had a legible copy.

During the prosecution's case, Miles' attorney thoroughly cross-examined Casper about his notes and his final report. Defense counsel established that Casper's final report contained only one sentence which summarily concluded that Contant's gun fired the bullet taken from Miles' leg. As for Casper's notes, Miles' lawyer got Casper to admit that his notes contained some recorded

measurements of groove impressions on the test bullets that were not identical to those on the bullet taken from Miles' leg./2

While he was testifying for the prosecution, Casper had his original (and quite legible) notes in his possession on the witness stand; however, neither Casper nor the government volunteered to give those original notes to Miles' lawyer, nor were they requested by the lawyer. After he finished testifying, Casper left the jurisdiction and took his original notes with him. Miles' attorney did not issue a subpoena to acquire Casper's original notes nor did he ask to re-call Casper to the stand.

During the defense case, Miles' attorney sought to admit into evidence Casper's final report and the copy of illegible handwritten notes which showed the measurement discrepancies between the bullet from Miles' leg and the test bullets. Miles wanted to show the jury Casper's final report because he believed that the report's brevity and conclusory nature would undermine its reliability in the jury's mind. Similarly, defense counsel asked to let the jury view Casper's handwritten notes so they could see the documented discrepancies between the groove impression measurements on the test bullets and those on the bullet from Miles' leg.

The district court denied Miles' requests and excluded both documents. Judge Gottschall refused to admit the notes since they were illegible and because they were cumulative as Casper had previously testified to the discrepancies in groove measurements. Judge Gottschall did, however, permit the defense to illustrate those measurement discrepancies by using a written chart during closing argument. The district court excluded Casper's final report because it was based on Casper's handwritten notes which were not admitted into evidence. Judge Gottschall also reasoned that since Casper was not there to explain any after-the-fact discrepancies the defense might point out, it would be unfair to admit the report.

Although the trial court never expressly mentioned the precise basis for excluding these two documents from evidence, a full and fair reading of the record illustrates that the documents were precluded under Rule 403 of the Federal Rules of Evidence. Rule 403 provides that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence.

Fed. R. Evid. 403. "Our decisions have emphasized that most relevant evidence is, by its very nature, prejudicial, and that evidence must be unfairly prejudicial to be excluded." United States v. Pulido, 69 F.3d 192, 201 (7th Cir. 1995). Evidence is unfairly prejudicial "if it will induce the jury to decide the case on an improper basis . . . rather than on the evidence presented." Id. A district judge's discretionary exclusion or "admission of evidence under Rule 403 of the Federal Rules of Evidence is entitled to special deference." United States v. Bradley, 145 F.3d 889, 892 (7th Cir. 1998).

We find the district judge's exclusion of these documents to be well within the bounds of her discretion. As the district court pointed out, Casper testified at length concerning the contents of both documents during direct and cross-examination. Thus, the facts in both of these documents were already a part of the record through Casper's testimony. Introducing the underlying documents would have served no purpose other than to repeat the testimony given by Casper. Since these documents "add[ed] very little to the probative force of the other evidence in the case," Judge Gottschall properly exercised her discretion when she excluded them as cumulative. See United States v. Kizeart, 102 F.3d 320, 325 (7th Cir. 1996); United States v. Williams, 81 F.3d 1434, 1443 (7th Cir. 1996).

Miles' second evidentiary argument pertains to a ruling that limited the scope of his cross-examination of security guard Keith Contant. When Chicago Police arrived to the scene of the attempted robbery, they interviewed Contant and learned that he had not registered his gun with the City of Chicago pursuant to a local ordinance. The City subsequently filed a complaint against Contant for violating the gun registration ordinance and Contant received a one-month suspended sentence for the violation. Anticipating that Miles may try to use this information to impeach Contant's credibility at trial, the government filed a pre-trial motion in limine seeking to preclude Miles from cross-examining Contant about the ordinance violation. Judge Gottschall granted the government's motion and Miles now claims that the ruling was a mistake because the ordinance violation constituted proper impeachment material under Rule 608(b) of the Federal Rules of Evidence.

Under Rule 608(b), "a witness's specific instances of conduct may only be raised on cross-examination if they are probative of truthfulness or untruthfulness," United States v. Manske, 186

F.3d 770, 774 (7th Cir. 1999), and if the probative value of the evidence outweighs any unfairly prejudicial effect. United States v. Saunders, 166 F.3d 907, 920 (7th Cir. 1999). The purpose behind the Rule "is to allow a party to attempt to cast doubt on a witness's reliability for telling the truth." Varhol v. National R.R. Passenger Corp., 909 F.2d 1557, 1567 (7th Cir. 1990) (en banc). Some instances of conduct plainly relate to a witness's truthfulness or untruthfulness. For example, we observed in Varhol that "[a]cts involving fraud or deceit" clearly cast doubt on a witness's truthfulness. Id. In contrast, other behavior may be obviously criminal, but not inherently connected to a witness's honesty or dishonesty. Thus, in Varhol we pointed out that crimes such as "murder, assault, [and] battery" may be probative of violence, but they do not normally bear on a witness's reliability for telling the truth. Id.

In United States v. Manske, we had to decide whether Rule 608(b) allowed cross-examination concerning a witness's threats of violence which were intended to influence the truthfulness of other people's testimony against him. 186 F.3d at 774. In determining whether this conduct was probative of truthfulness or untruthfulness, we adopted the view that "'behavior seeking personal advantage by taking from others in violation of their rights reflects on veracity.'" Id. (quoting Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, 154 (2d ed. 1994)). We also observed that while "the specific instance of conduct may not facially appear relevant to truthfulness, closer inspection [may] reveal that it bears on that issue." Manske, 186 F.3d at 775. Thus, applying this flexible approach and considering all of the facts surrounding the proffered evidence, we held that "threatening to cause physical harm to a person who proposes to testify against you is . . . probative of truthfulness." Id.

In this case, Miles insists that the district court should have allowed him to cross-examine Contant about his failure to register his gun with the City because this act is probative of Contant's untruthfulness. We disagree with Miles and conclude that Judge Gottschall correctly refused to let Miles cross-examine Contant about his failure to register his gun.

Although Contant's conduct did violate a City ordinance, the failure to register his gun does not necessarily implicate fraud, deceit, or dishonesty. There is nothing in the record to suggest that Contant had any deceptive intent. The undisputed facts show that Contant had purchased the gun nine years earlier as part of

his official police equipment while he was employed as a police officer for the City of Bridgeview, Illinois. When questioned by Chicago Police on the day of the robbery attempt, Contant had in his possession a valid Illinois Firearm Owners Identification card. Contant also produced a valid gun registration card issued by the Illinois Department of Regulation which authorized him to carry his gun as an employee of the bank. These facts strongly indicate that Contant's failure to register his gun with the City was an oversight rather than a deceitful act which would bear on his truthfulness. We therefore find that Judge Gottschall did not abuse her discretion when she prohibited Miles from questioning Contant about his failure to register his gun with the City.

III.  Conclusion

   For the foregoing reasons, we affirm  the decisions of the district court.


/1 Miles was on probation for an armed bank robbery. If intended as a rehabilitative tool, the probation was a marked failure.

/2 Casper went on to explain, however, that these differing measurements were of the gun's "general rifling characteristics" rather than the far more detailed "striations" which are unique to a particular firearm. Casper said that these minor differences in "general rifling characteristics" are to be expected and did not alter his conclusion that Contant's gun had fired the bullet recovered from Miles' leg.